EXHIBIT 2

Deposition of Lee Lambert

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

IMELDA CUYUGAN,  )
                )
         Plaintiff,  )
                )
    vs.         )   No. 4:15-cv-00260-RCC
                )
PIMA COMMUNITY COLLEGE DISTRICT,  )
LEE LAMBERT, in his personal  )
capacity,       )
                )
         Defendants.  )
_____)

DEPOSITION OF LEE LAMBERT

Tucson, Arizona

April 28, 2016

**CERTIFIED COPY**

RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
520/744-2293

Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

LEE LAMBERT
4/28/2016

### Page 10

1  Q. So there was a search association looking for a
2  chancellor for Pima Community College?
3  A. Yes.
4  Q. And they contacted you?
5  A. Yes.
6  Q. And you applied for the position, I'm assuming?
7  A. Yes.
8  Q. Went through the interview process; correct?
9  A. Yes.
10 Q. When did you actually physically arrive for the
11 first time at Pima Community College?
12 A. I'm not sure what you mean by that question.
13 Q. You were chosen to be the chancellor for Pima
14 Community College; correct?
15 A. Correct.
16 Q. I'm sure you came to visit before you became the
17 chancellor; correct?
18 A. That is correct.
19 Q. How many times?
20 A. I don't know off the top of my head, but I would
21 say somewhere between two maybe four maximum, I believe.
22 Q. Tell me about those visits.
23 A. I would come and meet with some staff to just
24 better get prepared for the role that I was going to be
25 assuming.

### Page 11

1  Q. Who did you meet?
2  A. I met a number of folks who would be reporting to
3  me.
4  Q. Do you remember those?
5  A. Some of them I do remember.
6  Q. Can you tell me?
7  A. So I would have met with Dave Bea, the finance
8  person of the college. I believe I met with C.J.
9  Karamargin. I met with Imelda. I think I met also Paul
10 Schwalbach was another person. He doesn't report directly
11 to me, Paul Schwalbach. Don't ask me how to spell his name.
12    And then I met other individuals. I don't
13 remember everybody off the top of my head.
14 Q. Did you meet with Jeff Silvyn?
15 A. I would imagine I met with Jeff, yes.
16 Q. Do you know when these meetings were,
17 approximately, the date?
18 A. I wouldn't know the dates off the top of my head.
19 Q. Would you remember the month?
20 A. Well, it would have been in between when I was
21 offered the job and before I started, so much of it would
22 have happened in May and June of 2013.
23 Q. So you are certain that you met with Imelda
24 Cuyugan before you actually started as a chancellor?
25 A. I'm pretty sure that I met but not individually.

### Page 12

1  It would have been with a group of individuals if memory
2  serves me correct.
3  Q. So the number -- the individuals you just told me
4  as individuals that at some point you met but not
5  necessarily one on one?
6  A. Right. I mean unless I go back and look at what
7  calendar they might have kept at the time I couldn't say who
8  exactly I met with one on one and who I didn't. I know I
9  met more than those individuals that I gave you the names
10 of.
11    But in terms of your client specifically all I
12 recall is meeting with her in a group setting.
13 Q. Do you remember who else was at that meeting?
14 A. I believe that Paul Schwalbach would have been in
15 that meeting. I believe C.J. Karamargin would have been in
16 that meeting but, again, unless I went back to a calendar to
17 confirm that I don't know for certain.
18 Q. Before you started as in the position of
19 chancellor do you remember ever discussing with anyone the
20 pending legal matters at Pima Community College?
21 A. When you say pending legal matters, what do you
22 mean by that?
23 Q. Just a meeting about legal issues that you had to
24 handle once you became the chancellor?
25 A. Clarify what you mean by legal. You mean a

### Page 13

1  lawsuit? Is that what you mean?
2  Q. Well, legal, as you know because you're an
3  attorney, would certainly encompass more than only a
4  lawsuit, but I'm referring to any internal complaints that
5  the attorneys were handling to lawsuits?
6  A. Okay. So there were concerns about allegations of
7  sexual harassment brought against the former chancellor, so
8  I would imagine that was part of why I would have met with
9  Jeff Silvyn.
10 Q. What did you know, what did you learn about that
11 aspect?
12 A. Well, I just knew that there was a set of I
13 believe eight women who had brought allegations against the
14 former chancellor.
15 Q. Did anyone tell you the names of those women?
16 A. I think at that time I'm not sure if I was given
17 the names of the individuals, but I would not say that it
18 wasn't but I won't say that it was.
19 Q. Did you know that, at that point did you know that
20 Imelda was one of those eight women?
21    MS. STATON: Object to the form in terms of
22 foundation at the point because you're saying at that point
23 so.
24    THE WITNESS: I, I don't think I could recall that
25 any one particular individual's name was given to me. Now

LEE LAMBERT
4/28/2016

### 18

1  seen making reference in any way to the agreement reached
2  between Pima Community College and Imelda?
3     A.  As far as I recall.
4     Q.  When you assumed the position of chancellor, did
5  you know that Imelda Cuyugan had reached a settlement
6  agreement with Pima Community College?
7     A.  Prior to accepting?  I mean prior to starting the
8  position?
9     Q.  No.  When you were.
10    A.  Once I was in the position?
11    Q.  In the position.
12    A.  By then I was aware of who the eight women are.
13    Q.  What else did you know?
14       MS. STATON:  At the time he was chancellor?
15    Q.  Correct.
16       Now I'm going to be asking questions once you are
17 chancellor.
18    A.  So when you say what did I know?
19    Q.  What did you learn about the eight women once you
20 were chancellor?
21    A.  That they had serious concerns about their
22 interactions with the former chancellor.
23    Q.  What else did you know?
24    A.  In terms of specifics?
25    Q.  Yes.

### 19

1     A.  Of each of the eight women?
2     Q.  Anything.
3     A.  Well, if you're talking about your client
4  specifically?
5     Q.  Well, let's start by her.
6     A.  Okay.  My understanding the allegation was that
7  she had some inappropriate interactions with the former
8  chancellor.
9     Q.  That she had inappropriate --
10    A.  Well, that he --
11    Q.  -- interactions?
12    A.  -- well, that there was inappropriate interactions
13 that occurred and her alleging that he had engaged in
14 inappropriate interactions.
15    Q.  Did you learn that she filed an EEOC complaint
16 regarding those allegations?
17    A.  Yes.  I learned that she had filed an EEOC
18 complaint.
19    Q.  Did you learn the specific allegations that were
20 included in the EEOC charge?
21    A.  You know, based on my memory I just know a little,
22 remember little pieces.
23    Q.  Can you tell me what you remember?
24    A.  So if I recall correctly, I believe that they were
25 in a hotel room.  Again, I don't know what actually occurred

### 20

1  in that room, but beyond that I'm not sure that I recall
2  much of anything between their interactions unless you
3  showed something to me to refresh my memory.
4     Q.  Do you remember anything regarding her allegation
5  that she was not selected for a position or removed by a
6  position?  Do you remember anything like that?
7     A.  Not off the top of my -- well, as it relates to
8  her allegations?
9     Q.  Correct.
10    A.  I know that she was not hired for a position.
11    Q.  Do you know anything else regarding that?
12    A.  Well, that position being the vice chancellor
13 position overseeing a certain area of the institution.
14    Q.  Do you remember the area?
15    A.  That would have been overseeing communications,
16 overseeing marketing efforts of the college, overseeing
17 federal relations.
18    Q.  Do you remember who got that position?
19    A.  Yes.
20    Q.  Who?
21    A.  C.J. Karamargin was hired into that position.
22    Q.  How did you learn all this?
23    A.  Well, of course once I started the job I was -- I
24 believe your client might have even told me some of these
25 pieces.

### 21

1     Q.  But you're not certain if she told you; correct?
2     A.  Well, your client did bring up the fact that he,
3  he got her job.
4     Q.  What do you remember?  Did you have a meeting with
5  her regarding that?  How did you --
6     A.  Well, I didn't have a meeting for that purpose,
7  but in a meeting that I've had with her she brought up that,
8  that piece.
9     Q.  Do you remember the date of that meeting?
10    A.  I think it might have happened on different
11 occasions.
12    Q.  So how many meetings do you think you had with
13 Ms. Cuyugan where her EEOC allegations were discussed?
14    A.  I don't recall having a discussion with her about
15 her EEOC case.
16    Q.  So what do you remember?
17    A.  What I remember, again, not discussing her EEOC
18 case because that was all resolved, I remember her saying to
19 me that he got her job.
20    Q.  What else do you remember her telling you about
21 her allegations?
22    A.  That's --
23       MS. STATON:  Object to the form.
24       Go ahead.
25    A.  Yeah.  That's pretty much what I recall.

Page 26

1 address the concerns.
2  Q. That's what you remember?
3  A. That's a general recall. Again, without seeing
4 the document I could not answer the specifics.
5  Q. And when you remember saying that the college,
6 saying to the Higher Learning Commission that the college
7 would address the concerns of these women that alleged
8 sexual harassment, as the chancellor what were your plans to
9 address those concerns?
10  MS. STATON: Object to the form, foundation.
11  THE WITNESS: Again, as I noted earlier, I met
12 with each of the women to better understand their concerns.
13  Q. To this date besides the women that went to the
14 EEOC what has Pima Community College done regarding the
15 women that simply stated and brought the concerns to the
16 college?
17  A. I'm still --
18  MS. STATON: Object to form.
19  A. -- unless you -- I'm not understanding your
20 question.
21  Q. From the eight women maybe two went to the EEOC,
22 correct, that you recall?
23  A. I think there might have been more than that but,
24 again, my memory is vague on how many.
25  Q. Regarding the women that alleged sexual harassment

Page 27

1 by Flores, the ones that did not go to anyplace besides Pima
2 Community College do you know what Pima Community College
3 has done for them to this date?
4  A. Well, so again, based on my memory there were some
5 of the women who weren't interested in doing anything beyond
6 sharing their concerns.
7  Q. Were there any that asked for anything?
8  A. There was some of the women who wanted more than
9 just acknowledgment of their concerns.
10  Q. Like whom?
11  A. I know that you mentioned Jacquelyn Jackson. I
12 know she wanted more than what the college was able to do.
13  Q. Do you remember what she wanted?
14  A. I believe she wanted some type of monetary
15 compensation.
16  Q. Did anybody else ask for anything else besides
17 acknowledgment? And I'm talking about women that did not go
18 to the EEOC.
19  A. I don't recall. There might have been one, maybe
20 two more but, again, I don't recall that without going back
21 and looking at past notes if there is such.
22  Q. Do you know what Maggie Romance requested?
23  A. I believe she went to the EEOC if memory -- so you
24 asked me about women who did not go to the EEOC.
25  Q. Was any settlement reached with any other women

Page 28

1 besides Imelda Cuyugan regarding the allegations of sexual
2 harassment against Flores?
3  A. Yes.
4  Q. Who else?
5  A. Mary Beth Ginter.
6  Q. Anyone else?
7  A. The way I interpret settlement is coming out of
8 the EEOC complaint, which she had, and we resolved that
9 through a settlement.
10  Q. And that is my question.
11  A. Yeah. I don't recall the others.
12  Q. You just remember a settlement with Mary Beth
13 Ginter?
14  A. Correct.
15  Q. Do you remember any settlement with Imelda
16 Cuyugan?
17  A. That was prior to my time.
18  Q. So going back to Ms. Cuyugan, when you became the
19 chancellor were you aware that Ms. Imelda Cuyugan was in the
20 position she was as part of a settlement that she reached
21 with Pima Community College?
22  A. At some point I became aware that she was in a
23 position as a result of some matters that occurred prior to
24 my arrival.
25  Q. Do you remember more or less when you learned of

Page 29

1 that?
2  A. It would have been probably after I arrived.
3  Q. After meaning like shortly after?
4  A. I don't know the particulars. I don't recall.
5  Q. So did you ever meet one on one with Imelda
6 Cuyugan when you arrived at Pima Community College?
7  A. I recall Imelda and I meeting. I don't know what
8 you mean by shortly. Her and I did have a meeting.
9  Q. Once you arrived and become the chancellor of Pima
10 Community College did you have a meeting with Imelda Cuyugan
11 one on one?
12  A. We had a meeting to discuss staffing concerns.
13  Q. What do you remember about that meeting?
14  A. I remember that she felt that she needed
15 additional staffing, and I told her based on my memory that
16 I didn't think that given the kind of work she was doing
17 that it required additional staffing. However, I also told
18 her that if you had it within your budget you could hire
19 additional support.
20  Q. Do you remember anything else?
21  A. In addition to that, I said to her that I didn't
22 feel that state and local should be broken out from federal
23 and that I would consider putting her under C.J. Karamargin.
24  Q. By that time had you been able to review the
25 educational and work experience that each of them had?

LEE LAMBERT
4/28/2016

**Page 30**

1  A. What do you mean by each of them?
2  Q. C.J. and Imelda?
3  A. I was generally aware of their backgrounds.
4  Q. So when you had that meeting with Imelda Cuyugan
5  and considered placing her under C.J., by that moment when
6  you were relaying this to Ms. Cuyugan had you made an
7  analysis of C.J.'s and Imelda's background and education and
8  work experience?
9  A. What do you mean analysis of their background and
10  work experience?
11  Q. Were you aware of their backgrounds?
12  A. When I come into an organization and people are
13  already in existing positions, I give the prior
14  administration the benefit of the doubt that they hired
15  capable and competent people for those positions.
16  Q. So my question is when you mentioned to Imelda in
17  that first meeting that you were considering placing her
18  under C.J. had you seen anything related to their
19  experience, resumes, for example?
20  A. That I don't recall specifically.
21  Q. When you met with Imelda Cuyugan, what did you
22  know about her before you -- you know, when you sat with
23  Imelda Cuyugan first meeting, did you have any knowledge
24  about her from any type of knowledge about her?
25  A. What do you mean about her?

**Page 31**

1  Q. What knowledge did you have about Imelda Cuyugan?
2  A. Other than what was in, like I said, in there was
3  an article and that's pretty much what I knew.
4  Q. So when you meet with her the first time you
5  already had read the article and knew that she had reached
6  an agreement with Pima Community College; correct?
7  A. Well, I would imagine because it was in the ether
8  that I likely had read before I had met her or even before I
9  arrived at the college.
10  Q. And when you tell me that you were considering
11  placing her under C.J. during that first meeting, would it
12  be correct to state that you had not seen the resume of C.J.
13  or Imelda Cuyugan?
14  A. It's very likely that I had not seen their
15  resumes.
16  Q. Are you aware that after that first meeting you
17  had with Ms. Cuyugan she sent an e-mail to Sylvia Lee?
18  A. I don't recall an e-mail off the top of my head.
19  Q. Do you remember -- I'm sorry.
20     Are you aware or were you aware at any time that
21  after that meeting you had with Ms. Cuyugan Ms. Cuyugan
22  talked to Sylvia Lee regarding your meeting with her?
23  A. I, I don't recall off the top of my head, but I
24  would not be surprised that Sylvia would have just reached
25  out to me.

**Page 32**

1  Q. Do you remember any time Sylvia Lee telling you by
2  e-mail or verbally that Ms. Cuyugan shared some concerns she
3  had regarding your meeting with her?
4  A. I'm not -- I don't recall any particulars.
5  Q. I'm not asking for particulars.
6     Do you recall Sylvia Lee telling you Ms. Cuyugan
7  brought some concerns to me regarding your first meeting
8  with her?
9  A. I don't recall off the top of my head.
10  Q. When you met with Ms. Cuyugan the first time, I'm
11  assuming it would be August, correct, August of 2013?
12  A. That sounds about right.
13  Q. Had you reviewed her performance evaluations?
14  A. I don't recall.
15     MS. STATON: Objection, asked and answered.
16  A. Oh, I don't recall that.
17  Q. Did you know anything about her performance at
18  that point?
19     MS. STATON: Same objections, asked and answered.
20     THE WITNESS: As I noted to you earlier, I always
21  give the benefit of the doubt to individuals who are already
22  in existing positions based on the prior administration's
23  decisions to put them in those positions.
24  Q. So what do you mean by that?
25     Do you mean that you do not make an objective

**Page 33**

1  analysis about their performance? You simply depend on the
2  previous administrator to know how good or bad that person
3  is?
4     MS. STATON: Object to the form.
5     THE WITNESS: First of all, I don't understand
6  what you're asking, but when I come into a new position I
7  give everybody the benefit of the doubt that they're capable
8  and competent for their roles that they currently sit in,
9  and that's where I start with them.
10  Q. So why did you think about placing Imelda Cuyugan
11  under C.J. versus Cuyugan -- C.J. under Cuyugan?
12  A. Well, C.J. was in a vice chancellor position, and
13  Cuyugan was in an assistant vice chancellor position, one.
14     Two, based on my experiences in this particular
15  area from being the president of Shoreline Community College
16  and having worked at other colleges, federal, state and
17  local are usually integrated into one area.
18  Q. Were you aware that Ms. Cuyugan before being in
19  the position she was she was handling state and federal
20  government relations?
21     MS. STATON: Object to the form.
22     THE WITNESS: Say that again.
23  Q. When you assumed the position of chancellor of
24  Pima Community College, were you aware that Imelda Cuyugan
25  under Flores was handling federal and state government

LEE LAMBERT
4/28/2016

## Page 34

1 relations?
2     MS. STATON: Object to the form, foundation.
3     THE WITNESS: I don't recall that being the case.
4  Q. You don't recall that?
5  A. I don't recall that aspect of it. What I --
6  Q. Did you know Ms. Cuyugan had lobbying experience?
7     Did you know that she had lobbying experience
8  before you coming to Pima Community College?
9  A. When I had my meeting with that group which
10 included her that's when I learned that she had
11 responsibility for lobbying at the state and local level.
12 Q. Did anyone tell you that Ms. Cuyugan also had
13 experience lobbying the federal government relations?
14 A. I don't recall that.
15 Q. Were you aware when you joined Pima Community
16 College that C.J. Karamargin had no experience lobbying?
17 A. I don't recall that.
18 Q. During the time that you were the first line
19 supervisor of Imelda Cuyugan, let's first try to determine
20 the time that you were his first line supervisor?
21    MS. STATON: I'm sorry. Whose first line
22 supervisor?
23    MS. BONILLA: Ms. Cuyugan's.
24    MS. STATON: Okay.
25 Q. So do you remember the date that you became the

## Page 35

1 chancellor of Pima Community College?
2  A. I started on July 1st of 2013.
3  Q. Do you remember more or less how long you were the
4  first line supervisor of Ms. Cuyugan?
5  A. It would have been four or five months perhaps,
6  not more than six months, if memory serves me correctly.
7  Q. How would you rate her performance based on the
8  more or less four to five months that you were her
9  supervisor?
10 A. Average.
11 Q. Were you the first line supervisor of
12 C.J. Karamargin?
13 A. Yes.
14 Q. How based on the time that you were the first line
15 supervisor of -- I'm going to refer to him as C.J.
16 A. Okay.
17 Q. How would you rate C.J.'s performance while you
18 were C.J.'s immediate supervisor?
19 A. Average.
20    (Whereupon Deposition Exhibit Number 2 was marked
21 for identification.)
22 Q. Do you remember this e-mail, Mr. Lambert?
23 A. Now that I'm looking at it, yes.
24 Q. And according to this e-mail you told Ms. Cuyugan
25 that she did great work; correct?

## Page 36

1  A. That's what it says.
2     (Whereupon Deposition Exhibit Number 3 was marked
3  for identification.)
4  Q. Based on this e-mail, Mr. Lambert, dated
5  September 7th, 2013, you shared -- when you say hi all, do
6  you mean the cabinet?
7  A. That's who I would have sent this message most
8  likely to.
9  Q. And Ms. Cuyugan answered -- I'm assuming she read
10 what you sent and answered by providing some ideas; correct?
11 A. I asked folks for their thoughts.
12 Q. And she gave you an idea of what she thought
13 should be done with the anti-tax group ATRA watching;
14 correct?
15 A. She gave a suggestion.
16 Q. And you said you bring up a very good point and
17 you wanted her to share with the cabinet her idea; correct?
18 A. Yes, her thoughts.
19 Q. Is this something that Imelda Cuyugan did often?
20    MS. STATON: Object to the form.
21    THE WITNESS: I don't understand what you mean by
22 often.
23 Q. Is this something that Imelda Cuyugan -- would you
24 say that she was proactive reading and giving ideas of how
25 you could accomplish things?

## Page 37

1     MS. STATON: Object to the form.
2     THE WITNESS: She would give ideas, sure.
3  Q. Did she provide good ideas?
4     MS. STATON: Objection to form, foundation.
5     THE WITNESS: I don't know what you mean by good
6  ideas.
7  Q. Did she -- according to your e-mail you bring up a
8  very good point. So would it be correct to state that you
9  sometimes praised her for the good points she brought up?
10 A. Of course I praised her and others for good points
11 they bring up.
12    (Whereupon Deposition Exhibit Number 4 was marked
13 for identification.)
14 Q. This is an e-mail dated September 30, 2013.
15    And if we start reading from the original e-mail,
16 this is an e-mail that's providing a snapshot of STEM data
17 gathered from the Brookings Institute and Pima PIR research;
18 correct?
19 A. That's what it appears to be.
20 Q. And she sent this to you, and your answer to her
21 was hi, Imelda, this is great information?
22 A. Yes.
23 Q. So would this be another example of good
24 information and data that she brought up to you?
25 A. It's another example of some good information,

LEE LAMBERT
4/28/2016

**Page 50**

1  Q. -- it should be the last signature, correct,
2  after --
3  A. Yes. I can just tell by some of the loops that it
4  must have been my signature.
5  Q. Did you get to discuss this evaluation with
6  Dr. Harris?
7  A. I don't recall specifically having a discussion
8  about this. I'm not saying I didn't have one, but I'm just
9  saying I don't recall it.
10  Q. By reviewing this evaluation here today, which you
11  signed in March of 2014, would you say it's a positive
12  evaluation?
13  A. Yes, it's a positive evaluation.
14  Q. Is there anywhere in this evaluation where it says
15  Ms. Cuyugan needs to improve in anything?
16  A. Well, unless I had time to read all the way
17  through it.
18  Q. Well, my question is based on the ratings. You
19  have master, advanced, proficient, needs development. Do
20  you see anywhere where it was chosen that she needed
21  development in any of the areas?
22      MS. STATON: Let me object to the form of the
23  question.
24      THE WITNESS: Based on the scale that's provided
25  here and the competency areas identified it does not note

**Page 51**

1  that she needed development.
2  Q. And this is as of March of 2014 --
3      MS. STATON: Object to the form, foundation.
4      Oh, are you finished? I thought that was a
5  question mark.
6      MS. BONILLA: No, no.
7      MS. STATON: Okay. I'll withdraw until you
8  finish.
9  Q. Chancellor Lambert, as of March of 2014 when you
10  signed this evaluation, this assessment, what is your
11  opinion of Ms. Imelda Cuyugan's performance?
12  A. That it's proficient.
13      MS. BONILLA: We've been like an hour and
14  20 minutes now so why don't we take a break.
15      MS. STATON: Okay.
16      (Whereupon a recess was taken from 11:21 A.M. to
17  11:35 A.M.)
18      (Whereupon Deposition Exhibit Number 13 was marked
19  for identification.)
20  Q. So the exhibit is basically the administrative
21  personnel policy statement adopted by the Board of Governors
22  of Pima Community College. And in that exhibit I included
23  2013-2014 and 2014-2015.
24      MS. STATON: Okay. That's fine. I just wanted to
25  make sure.

**Page 52**

1  Q. They're identical, I believe, but I just wanted
2  for the record to make sure we have the same policies.
3  A. Okay.
4  Q. And what I will ask you, Chancellor Lambert, is if
5  you can go to page 2.
6  A. Okay.
7      MS. STATON: The Bates stamp the last three digits
8  291?
9  Q. Correct.
10  A. Oh. '13-'14 or '14-'15?
11  Q. Well, let's do this first.
12      If you look at both documents, and you go to 291
13  and 293 --
14  A. Right. Okay.
15  Q. -- Section D, if you review both of them, would
16  you be able to tell me if -- I read them and they're exactly
17  the same, but I want to make sure that you agree with me.
18  A. Okay. They look identical.
19  Q. Correct. So basically it seems then that from
20  2013 through 2014 it was the same policy regarding
21  contracts; correct?
22      MS. STATON: Object to the form, misstates the
23  document.
24      THE WITNESS: Which documents are you referring
25  to?

**Page 53**

1  Q. So this is the policy regarding contracts,
2  employment contracts, correct, and employment procedure?
3  A. You are talking about this particular section of
4  this policy statement?
5  Q. Correct.
6  A. Yes.
7  Q. Does it address the employment procedure of Pima
8  Community College regarding administrators?
9  A. Yes.
10  Q. So from 2013 through 2015 the employment procedure
11  regarding administrative professionals was the same;
12  correct?
13  A. Unless I read every section I can't answer that
14  question that way, but what I can say is Section II D
15  appears to be the same, yes.
16  Q. So that's what we will be referring to, to
17  Section D, contracts. It states contracts are normally
18  prepared for a fiscal year. Contracts may in some
19  circumstances be for a shorter time period. And all
20  contracts for employment with the college must have the
21  prior approval of the Board of Governors. Salaries are paid
22  biweekly during the time of contract.
23      Correct?
24  A. That's what it says.
25  Q. Is that the policy of Pima Community College?

LEE LAMBERT
4/28/2016

### Page 54

1  A. This is the policy statement of the college.
2  Q. Regarding the hiring of administrative personnel;
3  correct?
4  A. According to Section II, Paragraph A, employment
5  procedures for administrative personnel shall conform.
6  That's the same line in both of these.
7  Q. So it says offer of new contract, and now I'm on
8  D 1 --
9  A. Okay.
10 Q. An administrator and/or executive administrator,
11 other than the position of chancellor, will be offered a new
12 contract for the ensuing fiscal year unless he or she is
13 otherwise notified in writing on or before February 15.
14 Decisions not to offer a new contract may not be grieved.
15    Is that what it states in the policy statement?
16 A. For which year?
17 Q. 2013-2014?
18 A. Yes.
19 Q. What do you understand is the policy based on what
20 we just read?
21 A. The way I read that is the board authorizes me to
22 offer folks a new contract for the ensuing fiscal year. It
23 doesn't say for how long. It just says I'm authorized to
24 offer new contracts.
25 Q. So according to this you need to give -- you need

### Page 55

1  to offer a new contract for the ensuing fiscal year unless
2  the administrator is notified in writing on or before
3  February 15; correct?
4  A. It says they will be offered a new contract for
5  the ensuing fiscal year unless they receive notification
6  otherwise.
7  Q. By February 15; correct?
8  A. Right. Right. So if I'm not going to offer them
9  a contract, then I have to tell them before February 15th.
10 Q. Correct?
11 A. That's what it says.
12 Q. Did you notify Ms. Cuyugan by February 15 of 2014
13 that you would not be offering a contract for 2014-2015?
14 A. Unless I have her actual contract in front of me I
15 would not be able to say that definitively, but what I do
16 recall is that we -- her name was listed with the names of
17 other administrators for the board to approve me to
18 authorize them receiving a contract for the ensuing year.
19 Q. That's not my question.
20    My question is if you recall notifying Ms. Cuyugan
21 before February 15 of 2014 that you would not be renewing
22 her contract for 2014-2015?
23    MS. STATON: Object to the form, foundation.
24    Go ahead.
25    THE WITNESS: Again, I don't recall notifying her

### Page 56

1  that she would not.
2     (Whereupon Deposition Exhibit Number 14 was marked
3  for identification.)
4     THE WITNESS: Is this two or just one? Okay.
5  Okay.
6  Q. So what I am showing you is the action item of a
7  meeting of the Board of Governors dated March 12, 2014;
8  correct?
9  A. Correct.
10 Q. In the recommendation the first paragraph it
11 states the chancellor recommends the Board of Governors
12 approve the following administrator regular appointments for
13 fiscal 2014-2015. Furthermore the chancellor recommends the
14 board authorize the chancellor or designee to sign
15 employment contracts for administrative personnel on behalf
16 of the college district.
17    So who writes this?
18 A. So in this case there's something -- there's
19 usually a line down here, but it appears that Mark Ziska
20 might have been the individual to have done -- prepared
21 this.
22 Q. And what is the recommendation? What is your
23 recommendation?
24    I'm not going into the background yet, but
25 basically let's stay on the recommendation. What is your

### Page 57

1  recommendation to the board?
2  A. That I be authorized to offer contracts for the
3  ensuing year.
4  Q. But it says the following administrator regular
5  appointments for fiscal 2014-2015. Wouldn't that be the
6  regular appointment of a one full year contract?
7     MS. STATON: Object to the form.
8     THE WITNESS: No. No.
9  Q. No. Why not?
10 A. That's not what regular means.
11 Q. So what does it mean?
12 A. It means that we hired you into a -- to be a
13 permanent employee of the college.
14 Q. A permanent employee?
15 A. So let me clarify for you. We hire people in
16 interim positions, in acting positions and then regular
17 positions. Okay. So she, like the other people on this
18 list, were hired as regular employees in their respective
19 positions.
20 Q. In the last paragraph in the background it states
21 it is essential to clarify that while the appointment of
22 each administrator may be for the full fiscal year his or
23 her assignment may be changed during the course of the year
24 in accordance with the applicable board policy. The
25 administrators listed on the attached pages are recommended

LEE LAMBERT
4/28/2016

**Page 62**

1  offered different kinds of contracts.
2  Q. Well, that would be different. Like it says it's
3  essential to clarify while the appointment of each
4  administrator may be for the full fiscal year, his or her
5  assignment may be changed during the course of the year.
6      Correct?
7  A. That's what the background says, part of what the
8  background says.
9  Q. So my question to you is it's not whether you
10 change the assignment of any of these individuals. My
11 question to you is did you offer a full year contract to all
12 of the individuals mentioned here on page PCC000233?
13 A. Unless I went through and reviewed each and every
14 one of them I could not answer that question definitively.
15 Q. Did you give -- did you offer a full year contract
16 to Dr. Albert?
17 A. I don't recall offering -- okay. Let me back up.
18 Okay. Some of these people decided to retire, so I don't
19 recall that we actually offered them a full year contract
20 because they left before the full year.
21 Q. So besides the ones that retired, entirely retired
22 is there anyone on this list that you did not offer a full
23 year contract besides Imelda Cuyugan?
24 A. Unless I went back and reviewed everybody's file I
25 cannot say that for every single person on this list. But I

**Page 63**

1  can say this about your client, she did not receive a full
2  year contract.
3  Q. Do you remember of anyone else that you offered a
4  contract that would not be for a full year?
5      MS. STATON: Objection, asked and answered.
6      THE WITNESS: I've already answered your question.
7  Q. So I'm asking you to remember.
8      Do you remember anyone else that --
9  A. As I --
10     MS. STATON: Let me object to the form.
11     Go ahead.
12 A. As I said, unless I go and look at each one of
13 these names and look at what the contract that was actually
14 offered I could not answer that question to the best of my
15 knowledge and truthfully.
16     MS. BONILLA: So then I will need to request the
17 copy of the contract of all of these individuals for
18 2014-2015, please.
19     MS. STATON: Give us the request for production,
20 and we'll do it.
21 Q. Mr. Lambert, based on the minutes of the regular
22 governing board meeting dated March 12th, 2014, did the
23 board approve your recommendation to approve the
24 administrators mentioned in PCC000233, including Ms. Imelda
25 Cuyugan, for regular appointments for fiscal year 2014-2015?

**Page 64**

1  A. Let me go to the board minutes here.
2      MS. STATON: Could you read that question back,
3  please, just so I've got it?
4      (Whereupon the record was read by the reporter as
5  follows:
6      "Q. Mr. Lambert, based on the minutes of the
7  regular governing board meeting dated March 12th,
8  2014, did the board approve your recommendation to
9  approve the administrators mentioned in PCC000233,
10 including Ms. Imelda Cuyugan, for regular
11 appointments for fiscal year 2014-2015?")
12     MS. STATON: Thank you.
13     THE WITNESS: And it says here all board members
14 present voted aye to 17.4. That's the item on the consent
15 agenda.
16 Q. So what would be the answer to my question?
17 A. Imelda was on that list.
18 Q. And according to the minutes did they approve your
19 recommendation to approve the following administrators
20 including Imelda Cuyugan for a regular appointment for
21 fiscal year 2014-2015?
22     MS. STATON: Object to the form.
23     THE WITNESS: They approved the list that we put
24 forward for them, yes.
25 Q. For regular appointments for fiscal year

**Page 65**

1  2014-2015; correct?
2      MS. STATON: Object to the form.
3      THE WITNESS: I've already answered that question.
4  Q. I'm asking you to answer it again, please.
5  A. As I said, they gave me the authorization to offer
6  regular contracts to the folks on the list.
7  Q. Regular appointments; correct?
8  A. Regular as it's noted in the policy, yes.
9  Q. And it would be for fiscal year 2014-2015;
10 correct?
11     MS. STATON: Object to the form.
12     THE WITNESS: That is, that is correct in terms of
13 what was being recommended.
14     (Whereupon a discussion was held off the record.)
15     (Whereupon Deposition Exhibit Number 15 was marked
16 for identification.)
17 Q. Chancellor Lambert, showing you what is dated
18 May 29th, 2014, it's an e-mail from Zelema Harris to you;
19 correct?
20 A. Correct.
21 Q. And they copied Rachelle Howell.
22     At that point what was the position of Rachelle
23 Howell?
24 A. I don't recall what her specific position was
25 without going back and reviewing the file.

LEE LAMBERT
4/28/2016

## Page 70

1  I'm pretty sure it was early November.
2    Q. You say you hired Dr. Harris to come back to the
3  college. What was the purpose of you hiring her?
4        MS. STATON: Objection, asked and answered.
5        Go ahead.
6        THE WITNESS: Based on my recollection the college
7  had a number of challenges in front of it, and I needed
8  someone who had the experience to be part of a team to help
9  us move things in the right direction.
10   Q. So would it be then correct to state, if I'm
11 understanding your testimony correctly, that you started
12 talking to Dr. Harris about a possible reorganization
13 shortly after you hired Dr. Harris?
14   A. I, I don't know exactly when I talked to her about
15 it, but I would have had a conversation with her before she
16 came onboard about having to look at the college as a whole.
17   Q. In this e-mail from Dr. Harris to you she mentions
18 the affected parties including C.J. and Imelda.
19       When did the idea of C.J. and Imelda being
20 affected by the reorganization first came up?
21   A. So let's back up. When I first brought Dr. Harris
22 onboard, I put her over the area in which C.J. and Imelda
23 and others were in. So that's the first part.
24       So it was with the mind of taking a look at what
25 makes the most sense for the institution.

## Page 71

1    Q. Okay.
2    A. So that was in the very earliest stages.
3    Q. Who came up with the idea of Imelda's department
4  being eliminated?
5    A. I received that recommendation from Dr. Harris.
6    Q. And what did she tell you her recommendation was
7  based on?
8    A. I don't recall the particulars.
9    Q. If I asked you why was the department of state
10 government relations eliminated, would you be able to
11 answer?
12   A. Well, again, she brought forward a recommendation,
13 and looking at that recommendation it made sense. It
14 aligned with my thinking to combine federal, state and
15 local.
16   Q. So what was the idea of the reorganization? Where
17 would state, federal, local end up?
18   A. It would end up under this newly configured
19 organization. Again, I don't remember if the actual name
20 ended up being institutional advancement, but it would fall
21 under that umbrella. It would no longer be split.
22   Q. Did you discuss the possibility of putting
23 federal, state and local under Imelda Cuyugan? Did you ever
24 discuss that?
25   A. I don't recall that particular type of

## Page 72

1  conversation. I'm not saying that didn't happen. I just
2  don't recall it off the top of my head.
3    Q. Did you ever discuss with Dr. Harris allowing
4  Imelda to stay doing another function the full year?
5    A. I don't recall having that kind of conversation.
6    Q. Did you at some point ask Ms. Cuyugan to report to
7  your assistant, Gabby Echeverria, every morning?
8    A. I, I had asked that Imelda let us know when she's
9  coming into the office because there were concerns about
10 Imelda being at her office at 8:00 A.M. in the morning on a
11 consistent basis.
12   Q. Did you ask any other administrator to report to
13 your assistant every day when she or he went to work?
14   A. I asked the administrators who we had concerns
15 about them showing up to work, so there was only Imelda
16 based on my recollection. But again, she wasn't reporting
17 to Gabby. She was just letting us know that she has arrived
18 to work at 8:00 A.M.
19   Q. But you asked her to go physically to Gabby and
20 say I'm here?
21   A. Yes. Let us know you're here because, again,
22 there were concerns about your client coming into the
23 office.
24   Q. You were concerned that she was not going to the
25 office?

## Page 73

1    A. That she wasn't coming into the office and putting
2  in a full day's worth of work.
3    Q. Did you -- what was the system for you to know
4  when your cabinet would -- the hours of work? What was the
5  policy?
6    A. The administrators are in effect on a non -- for
7  lack of a better way to call it we don't keep track of their
8  work hours and workdays because they're exempt employees.
9        The only time I would have a concern about that is
10 when it's brought to my attention that folks may not be
11 coming in and putting in a full day's worth of work, and
12 which was the case for your client.
13   Q. And how did you know that?
14   A. Well --
15   Q. Like did you go every day at 8:00 and every day at
16 night to see her office and see if she was there?
17   A. No. I did not do that personally, but I had an
18 employee bring forward a concern about Imelda showing up to
19 work. There was a complaint actually filed regarding that
20 issue.
21       Also, I believe the former interim chancellor had
22 noticed that your client was questionable about her
23 attendance, and so I had reasons to believe that from time
24 to time there may be concerns.
25   Q. So you based your concern on what other people

LEE LAMBERT
4/28/2016

Page 82

1 　　　　THE WITNESS: I don't think --
2 　　　　MS. STATON: Wait, wait, wait, wait.
3 　　　　Object to the form, foundation.
4 　　　　Now go ahead.
5 　　　　THE WITNESS: I don't recall any specific thing
6 off the top of my head.
7 　　Q. Was the call -- was there some concern about them
8 that you did not retain Imelda Cuyugan?
9 　　A. I, I don't think that -- they weren't calling me
10 to say don't do this. That's not what the nature of the
11 call was from my best as I can recall.
12 　　Q. But the truth is they didn't tell you we are happy
13 you did that; correct?
14 　　　　MS. STATON: Object to the form, foundation.
15 　　　　THE WITNESS: Well, first of all, I don't know
16 what you mean by happy.
17 　　Q. Was the call -- were the legislator, were the
18 legislators that called asking why you did it?
19 　　　　MS. STATON: Let me object to form and foundation.
20 　　　　THE WITNESS: Well, first of all, I don't remember
21 the sequencing of everything. Okay. That's the first part.
22 　　I know that I also reached out to some lawmakers
23 so that I could explain the changes we were undergoing.
24 　　So I don't know in what order. Did they call me
25 before I called them? I don't know the answer to that. But

Page 83

1 it wasn't about how you're making it sound as that it was
2 some -- as if it was antagonistic, which was not the case at
3 all.
4 　　Q. No. I'm not saying that it was antagonistic, but
5 what I'm saying is that you did receive phone calls from
6 legislators saying, you know, why did you make this change,
7 not even an antagonistic way but trying to understand why?
8 　　　　MS. STATON: Object to the form, foundation.
9 　　　　THE WITNESS: I had conversations with lawmakers
10 to explain the changes we were undergoing.
11 　　Q. What did they tell you?
12 　　　　MS. STATON: Object to the form, foundation.
13 　　　　THE WITNESS: I don't understand what you mean.
14 　　Q. What did these legislators tell you?
15 　　A. They didn't tell me anything.
16 　　　　MS. STATON: Same objection.
17 　　A. Sorry.
18 　　Q. They didn't tell you anything?
19 　　A. Not in -- first of all, I don't know what you mean
20 by telling me.
21 　　Q. What did they -- when they -- who called you?
22 Let's start who do you recall calling you?
23 　　A. I had conversations. Like I say, I don't remember
24 if they called me or I called them because I did reach out
25 to some. So I would imagine I spoke with Bruce Wheeler. I

Page 84

1 believe I spoke with Gabaldon. I don't know who else I
2 would have spoken to. I don't remember the level of
3 individuals without going back and looking at my calendar.
4 　　Q. Did you talk to Cajero Bedford?
5 　　　　MS. STATON: I'm sorry. Who?
6 　　　　THE WITNESS: I may have talked to Senator
7 Bedford.
8 　　Q. Cajero Bedford.
9 　　And this was after it was announced that Imelda
10 Cuyugan was not going to be a lobbyist for Pima Community
11 College anymore; correct?
12 　　A. I believe so.
13 　　　　MS. STATON: When you get to a point that we can
14 break to go to lunch, whatever --
15 　　　　MS. BONILLA: I was thinking if that's okay with
16 you like a little bit closer to 1:00 and then we come back?
17 Or is it too much?
18 　　　　MS. STATON: He's the one that's got to answer the
19 questions, not me so.
20 　　　　MS. BONILLA: I leave it up to you.
21 　　　　THE WITNESS: I can go a little bit longer.
22 　　　　MS. BONILLA: Good.
23 　　　　MS. STATON: Can we go about maybe 10 till? Would
24 that be --
25 　　　　MS. BONILLA: Sure. 10 till.

Page 85

1 　　　　MS. STATON: Okay.
2 　　Q. You mentioned that part of the reason for the
3 reorganization was that you had 17 people so you wanted to
4 streamline the administrators you had; correct?
5 　　A. What I wanted to do was reduce the number of
6 individuals reporting directly to the chancellor.
7 　　Q. Tell me what motivated the decision -- let me ask
8 it to you this way.
9 　　You did not renew a full year contract for Imelda
10 Cuyugan for 2014-2015; correct?
11 　　A. At that point correct.
12 　　Q. At which point?
13 　　A. Well, at the point that we issued her a shortened
14 contract.
15 　　Q. So you did not offer Imelda Cuyugan a contract, a
16 full year contract for 2014-2015; correct?
17 　　A. That's correct.
18 　　Q. What was the reason for that?
19 　　　　MS. STATON: Objection, asked and answered.
20 　　　　THE WITNESS: I've already answered that.
21 　　Q. Can you answer that?
22 　　A. We went through a reorganization of the area in
23 which she reported.
24 　　Q. And did you take -- was Ms. Cuyugan's performance
25 in any way a reason for not renewing her contract?

LEE LAMBERT
4/28/2016

**90**

1  THE WITNESS: Right. Right.
2  The office, meaning institutional advancement,
3  would have all of these areas under it, and state and
4  federal relations is an aspect of that. That's what it
5  says.
6  Q. So they don't tell -- it says what is his role?
7  What is his role going to be?
8  A. It says the specific duties, responsibilities,
9  objectives and goals of your position --
10  MS. STATON: Slow down. Slow down.
11  A. Do you need me to read that again?
12  Okay. Of your position are in the process of
13  being developed and will be provided to you as soon as
14  possible, no later than August 1st.
15  Q. Based on your knowledge what is it that C.J. ended
16  up doing? What would be his duties, responsibilities and
17  objectives and goals?
18  A. So you know, again, without me going back in time
19  and looking at the particulars related to him, he would
20  still be responsible for public information and media
21  relations. I'm not sure what else on here. I think state
22  and federal might have come under him as well.
23  Q. So based on this document the aspect of state and
24  federal relations was still something that was going to
25  continue being done inside of Pima Community College;

**91**

1  correct?
2  A. No. Oversight of some of the day to day
3  components of it would be.
4  Q. So why didn't you leave Imelda Cuyugan in a lower
5  role still responsible for state and federal relations?
6  A. Because we were no longer going to have it being
7  involved at the strategy type level that I described
8  earlier.
9  Q. Explain that to me because I'm very confused.
10  A. I don't understand why you'd be confused. But
11  anyways so we had the former position was responsible for in
12  part the overall strategy for state and local relations.
13  Then we have an individual who handled a lot of the
14  administrative aspects of the job.
15  We essentially eliminated that top level component
16  that's associated with the AVC position along with the
17  salary line associated, the benefits line, which was
18  substantial, but we kept in place that administrative
19  component there.
20  There was someone already essentially in a
21  position doing that work. So this was not exempt
22  administrative level work.
23  So when we eliminated this, she was no longer in
24  effect in a position that's available at the college.
25  Q. When you say she, I'm assuming that's Imelda

**92**

1  Cuyugan?
2  A. Correct.
3  Q. And you mentioned another position. Who are you
4  referring to?
5  A. So there was a person, I believe, reporting to
6  Imelda at the time, Michael Peel --
7  Q. Okay.
8  A. -- doing more of the administrative assistant type
9  support work.
10  Q. Why didn't you eliminate the position of Peel,
11  allowing Imelda to stay in her position at a lower salary?
12  A. Because we had an employee in that position, A.
13  Plus it's a different employee category altogether.
14  Q. But wasn't Imelda Cuyugan informed that her
15  department would be eliminated?
16  MS. STATON: Object to the form, foundation.
17  THE WITNESS: I, I cannot say what was exactly
18  told to her in terms of that particular piece from
19  Dr. Harris, but we didn't eliminate the need to do this
20  work. We eliminated the need to do that part of the work
21  internally.
22  Q. So it would be helpful for the record if you tell
23  me the need to do this work, what do you mean by this work?
24  A. The strategy level, as I mentioned earlier,
25  helping to develop the strategy, working directly with the

**93**

1  lawmakers in terms of that strategy and then overall
2  advocacy for the institution.
3  Q. So who would be doing that after you eliminated
4  Imelda?
5  A. We would contract it out, which is what we did in
6  terms of the state portion.
7  Q. And what about the federal?
8  A. At the federal level we work with our American
9  Association of Community Colleges who has a specific
10  individual and team in place to do the federal components
11  for us.
12  Q. So what are the responsibilities of Michael Peel
13  now?
14  A. So things have evolved since we've been there, but
15  he's still in a lower employee group and classification.
16  He's not at the administrative exempt personnel level.
17  Q. Is he a lobbyist?
18  A. So depending on how one defines that term.
19  We have identified individuals that we have
20  reported to the State of Arizona as lobbyists, not because
21  we necessarily agree that the person is engaged in lobbying,
22  but to throw caution to the window we have identified
23  certain individuals. I am essentially at the college the
24  chief lobbyist for the institution, but we contract out with
25  Jonathan Paton to be our lobbyist. And then we have added

RAYNBO COURT REPORTING, LTD.

LEE LAMBERT
4/28/2016

**Page 94**

1  some other individuals on that list.
2  Q. Who are those?
3  A. I believe Michael Peel was one of those
4  individuals. I'm not sure if Libby Howell is on that list.
5  But again, we only did that to be cautious about the
6  requirements that the State of Arizona has, not that that's
7  what their key roles are for the organization.
8  Q. Do you have any other lobbyists registered with
9  the state?
10  A. I haven't seen the actual list, so I don't know
11  who all else is on the list. So I'm not saying that's an
12  exhaustive list.
13  MS. STATON: Are you at a point where we can --
14  are you at a breaking point or no? I mean if you --
15  MS. BONILLA: Well, I still have --
16  MS. STATON: Oh, I know you have lots to go
17  through, but I'm just saying, you know.
18  MS. BONILLA: No. Just give me five more minutes.
19  MS. STATON: Sure.
20  Q. So according to what you're telling me Jonathan
21  Paton, Michael Peel, Libby Howell and yourself are
22  lobbyists, registered lobbyists for Pima Community College?
23  A. So I don't know about Libby, if she's on that
24  list. Like I said, I don't remember seeing the actual list.
25  But we have identified individuals throwing

**Page 95**

1  caution to the wind to make sure we put them on the required
2  reporting to the State of Arizona.
3  Q. How much do you pay Michael Peel? Do you know?
4  A. I don't know off the top of my head, but it's
5  certainly under 100 thousand.
6  Q. What about Jonathan Paton?
7  A. Again, I don't know what the contract amount is
8  off the top of my head, but I believe it's under 100,000.
9  Q. Did you offer Ms. Cuyugan an opportunity to stay
10  as a lobbyist at a lower level and a lower salary?
11  MS. STATON: Object to the form, foundation.
12  THE WITNESS: No.
13  Q. Why not?
14  A. Because we no longer had work available for an
15  additional person at that level.
16  Q. But why didn't you offer her the position of
17  Michael Peel?
18  MS. STATON: Objection, asked and answered.
19  THE WITNESS: I already answered that question.
20  Q. Can you answer it again?
21  A. As I noted, Michael Peel is in a different
22  employee group performing a different type of work than what
23  that top level lobbyist position would have been performing.
24  Q. Who made the decision to retain Michael Peel?
25  A. The recommendation came to me from Dr. Harris.

**Page 96**

1  Q. Did you have anything to do with that decision?
2  MS. STATON: Object to the form.
3  THE WITNESS: Other than I received the
4  recommendation and I accepted the recommendation.
5  Q. How long had Michael Peel been with Pima Community
6  College when you accepted that recommendation?
7  A. I don't know when specifically he was hired, but I
8  think at that point he probably hadn't been at the college
9  more than a year.
10  Q. And how long had he been there?
11  A. That I don't know how long he had actually been at
12  the college.
13  Q. Isn't it true that Michael Peel was hired by Pima
14  Community College after you came to the college?
15  A. Again, I don't know what his employment status was
16  with the college before I arrived, but coming into the
17  position that he was then working for Imelda that happened
18  after I was at the college.
19  Q. So do you know how long he had been working for
20  Imelda?
21  A. Well, when Veronica, I believe her name was
22  Veronica transferred to another position, that's when we
23  went out and recruited and filled that position, and I
24  believe that's the position that Michael Peel was in.
25  Q. Correct.

**Page 97**

1  A. Yes.
2  Q. So he had not been with the college more than a
3  year when you made a decision to retain Michael Peel;
4  correct?
5  A. As far as I know in the position, he was not in
6  that position more than a year.
7  Q. Do you know how long Imelda Cuyugan worked for
8  Pima Community College?
9  A. I don't remember the actual number of years, but I
10  know it had been for awhile.
11  Q. Do you know -- well, do you know how long C.J. had
12  been with Pima Community College?
13  A. I believe it was less than Imelda, but I don't
14  know exactly the number of years.
15  Q. Do you know the reason why C.J. left Pima
16  Community College?
17  A. He took another position.
18  Q. You would have retained C.J. for a long time based
19  on your interactions with him?
20  MS. STATON: Object to the form.
21  THE WITNESS: I don't understand what you mean by
22  long time.
23  Q. Were you very, very satisfied with C.J.'s
24  performance?
25  A. As I mentioned earlier he was average.

RAYNBO COURT REPORTING, LTD.

LEE LAMBERT
4/28/2016

98

1  Q. Why didn't you eliminate his position? Why didn't
2  you eliminate the position of C.J. Karamargin?
3  A. We eliminated the vice chancellor position in
4  which he sat and then kept some of the pieces when she
5  was -- had oversight and performed. We still had a need for
6  those areas, and I wanted to maintain oversight of that work
7  directly.
8  Q. Did you get along with C.J.?
9  A. Yes, as far as I know.
10  MS. STATON: Okay. We're getting close to
11  1 o'clock here. Let's get through this exhibit, and then
12  we're going to take a break.
13  (Whereupon Deposition Exhibit Number 18 was marked
14  for identification.)
15  Q. Did you get along with C.J. better than you got
16  along with Imelda?
17  MS. STATON: Object to the form.
18  THE WITNESS: I don't look at my employees that
19  way. They all come with their own unique talents, their own
20  unique skills, and so I judge them based on their individual
21  capabilities and their relationship with me.
22  Q. And their relationship with you?
23  A. Yes.
24  Q. Did you have a good relationship with Imelda
25  Cuyugan?

99

1  A. As far as I know we had a good relationship.
2  Q. This is an e-mail that you sent to Charlotte --
3  A. Fugett.
4  Q. -- Fugett dated June 20, 2014?
5  A. Correct.
6  Q. It says that you met with Imelda to discuss her
7  options?
8  A. Correct.
9  Q. What options did you give her?
10  A. That, as I mentioned here, that we're going to
11  eliminate her AVC position, so we're going to put her on a
12  shortened contract, that we would encourage her to look for
13  other positions with the college. So that was essentially
14  the options we were saying. We want to support you in
15  finding another opportunity here at the institution.
16  Q. So you agreed to issue her a three month contract.
17  Why? Why did you do that?
18  A. Well, to give some time to look at other
19  opportunities within the college but also allow time to
20  transition from into the new model.
21  Q. Into the new what?
22  A. Into the new reorg. structure of that unit.
23  Q. But isn't it true that you already knew there was
24  no position for her in that reorganization?
25  MS. STATON: Object to the form.

100

1  THE WITNESS: I -- so as I mentioned, we had
2  reorganized the position and we created the vice chancellor
3  for institutional advancement, so there was a position in
4  that unit but it was at a higher level. So that was an
5  opportunity for her to apply for that position.
6  Q. Who else was at that meeting with you and Imelda?
7  A. I, I don't recall off the top of my head, but I
8  believe Jeff Silvyn might have been.
9  MS. STATON: Look at the first line.
10  A. Right. Right.
11  Q. Is it only Jeff Silvyn, you and Jeff Silvyn?
12  Anyone else involved?
13  A. I, I don't recall everyone who was at that meeting
14  at that time. I believe Jeff was there. Might have been
15  one other person.
16  Q. Then in the last paragraph you say we also
17  informed her that she may be placed on administrative leave
18  related to allegations of misconduct.
19  What are you referring to?
20  A. So during this same time period coincidentally, it
21  was not staged, we received a concern from a community
22  member of a potential impropriety on the part of your
23  client.
24  It was just an allegation, but it was severe
25  enough that I felt that we needed to look into it.

101

1  Q. Did you explain to Ms. Cuyugan in that meeting
2  what the allegations of misconduct were?
3  A. I believe we shared with her what the general
4  concerns were.
5  Q. Did you show her any documents that were sent to
6  you regarding the allegations?
7  A. I don't recall how, how -- that level of detail.
8  MS. BONILLA: We can take a break.
9  (Whereupon a recess was taken from 1:00 P.M. to
10  2:10 P.M.)
11  Q. Going back to two exhibits that we were looking
12  at, those are Exhibits 16 and 17 --
13  A. Okay. 16. Okay.
14  Q. -- so staying with Exhibit 16 for a moment --
15  A. Okay.
16  Q. -- which is the memorandum --
17  A. Right.
18  Q. -- that was sent from your office, I asked Pima
19  Community College to provide me any and all documents
20  related to the reorganization --
21  A. Okay.
22  Q. -- that is referenced in this memorandum. And
23  this is, this memorandum, is all I got.
24  A. Okay.
25  Q. So when you gave the green light to Dr. Harris to

RAYNBO COURT REPORTING, LTD.

LEE LAMBERT
4/28/2016

## 102

1  work on a restructuring, did you ever meet with her and see
2  documents?
3     A. So she would have presented me a packet of
4  organizational charts that would have shown where everything
5  goes visually, so we have that.
6     Q. You remember seeing the organizational charts?
7     A. Yes. I have a copy in my office, yes. Yes.
8     Q. And is your recollection that you saw that before
9  making this decision or after?
10    A. It would have been during that same time period.
11 So I would, I would imagine it was before the final
12 decision.
13    Q. Besides seeing organizational charts did you ever
14 review anything else with Dr. Harris to make the decision
15 that you made that she recommended that you accepted of
16 making some changes?
17    A. When you say anything else, is there a particular?
18    Q. Any other document?
19    A. I don't recall any other document.
20    Q. Did you sit down and analyze the individuals and
21 their positions and their background? Anything like that?
22    A. I don't recall doing it to that level of detail
23 with each of the positions.
24    Q. When I look at Exhibit 16, the memorandum that
25 came from your office, the last sentence of that page, the

## 103

1  first page, the last sentence of the first page --
2     A. Oh, the first page. Okay.
3     Q. -- says the college will have a new position of
4  vice chancellor for institutional advancement. This office
5  will be responsible for, and it says marketing, enrollment
6  management, public information and media relations, media
7  production and publications, web systems, grants, foundation
8  and alumni association and college events.
9        When I look at the letter that was sent to C.J.
10 Karamargin, it says, again, it's making reference to that
11 same office --
12    A. Right.
13    Q. -- but it includes state and federal relations.
14       Did you notice that?
15    A. I, I, again, I would not have probably picked up
16 on that distinction as part of this communication vis-a-vis
17 that other piece because we called that out separately in
18 this letter because it was a change that was occurring.
19    Q. So is the vice chancellor for institutional
20 advancement responsible for state and federal relations
21 according to this reorganization or not?
22    A. Yes. It would have been responsible for those
23 pieces as well.
24       (Whereupon Deposition Exhibit Number 19 was marked
25 for identification.)

## 104

1     Q. So according to these org. charts it says
2  institutional advancement July 21, 2014.
3        Do you know if that's when this was created?
4     A. Say that again.
5     Q. Do you know whether this is the date when these
6  documents were created?
7     A. I don't know what the specific date of when the
8  actual document was created.
9     Q. Are these the organizational charts that you were
10 making reference to that you reviewed before --
11    A. Yes.
12    Q. -- the memorandum went out?
13    A. Well, I'm not sure the exact time, but yes, this
14 is the organizational chart I was referring to.
15    Q. So according to this organizational chart who was
16 going to be in charge of federal relations?
17    A. So we hadn't completely split it out and/or I
18 should say put it all into one yet. So you see in here the
19 federal piece was going to be under enrollment management
20 and then the point of contact for lobbyists was going to be
21 Michael Peel. So we were going to have a lobbyist handling
22 that state effort for us. And then if you notice these
23 lines, they all come back and intersect to Rachelle Howell.
24    Q. So before you sent out the memorandum you knew
25 that Rachelle Howell was going to be in charge of

## 105

1  institutional advancement?
2     A. Again, I don't know the timing because we had
3  opened up the position and Rachelle and Imelda applied for
4  that, so I forget the exact timing.
5        So before this versus that I don't know the
6  timing. But if you notice here, Rachelle was overseeing
7  marketing and not institutional advancement as it was
8  conceived in this org. chart.
9     Q. When I go to page PCC011788 --
10    A. 78, okay.
11    Q. 788.
12    A. 788, okay.
13    Q. It just doesn't go with this first page.
14    A. Okay.
15    Q. As you can see, it says institutional advancement,
16 public information and federal government relations. And
17 then they put C.J. --
18    A. Uh-huh.
19    Q. -- but I don't see where the government relations,
20 federal government relations is on that page.
21       And then but first you had it under, actually,
22 under Heather Tilson?
23    A. Right. Right.
24    Q. So do you remember anything about that?
25    A. Well, like I said just a moment ago, we hadn't

LEE LAMBERT
4/28/2016

106

1  fully put everything into place, so it was ever evolving.
2  So the holding tank was under enrollment management at that
3  point in time.
4      Q.  So then would it be correct to state based on your
5  testimony that as of July 21, 2014, you were still figuring
6  out where everyone would end up?
7      A.  The finer, the finer pieces.  Okay.  The big
8  blocks we pretty much knew, meaning the top level positions.
9      Q.  There were still openings and ways of -- there
10  were still openings and decisions to be made as to where to
11  place everyone underneath the high level positions?
12          MS. STATON:  Object to the form.
13          THE WITNESS:  Well, again, you know, without me
14  going and studying this very closely I can't answer that
15  question specifically, but I will make note of the
16  government relations part we had an employee already at the
17  college who was the frontline person on that.
18      Q.  And who was that?
19      A.  That was Donna Martinez, if I recall her name
20  correctly.  So that was not available as an option because
21  of Donna being in that position.
22      Q.  Do you remember what Donna Martinez's position
23  was?
24      A.  I don't remember the title.
25      Q.  So was she in charge of government relations?

107

1      A.  I just said she was in charge of federal.
2      Q.  Federal.
3      A.  But not at the administrative exempt level.
4      Q.  So by June of, June or July of 2014 Donna Martinez
5  was in charge of federal relations?
6          It's not that -- I hear you.  I just want to make
7  sure I understand what you're saying.
8      A.  So what I'm saying is when I arrived at the
9  college Donna Martinez was already in a position tied to
10  federal government relations, and through this change based
11  on my recollection she was still in that role at the point
12  of this.
13          Now things have evolved since then.  So I don't
14  know exactly at what point did we move her from that to then
15  she went into a different role.  And now she's even in a
16  different role as we speak.
17      Q.  Because according to this document if we go to --
18      A.  Which?
19      Q.  -- Exhibit --
20          MS. STATON:  It's 19.
21      Q.  -- 19, if you go to page Bates Stamped
22  PCC011784 --
23      A.  Okay.
24      Q.  -- you have Donna Martinez as program manager of
25  marketing?

108

1      A.  Okay.  So what we did because it goes back to,
2  like I said, things were still evolving, so when you look at
3  the enrollment management area, we created that area and
4  brought back an outreach team.
5          And we had a vacancy for the person who was going
6  to be the frontline supervisor.  Donna Martinez ends up in
7  that interim role.  I believe that's what this reflects back
8  here.
9          So that's why it gets a little confusing when you
10  look at these things because she shows up in different
11  places because of her being able to take on that different
12  elevation.
13      Q.  So do you have any idea what this date means?  Do
14  you know whether this is when it was created?  When you were
15  discussing it?  What?
16          MS. STATON:  I'm sorry.  What date are we --
17      Q.  The date on --
18      A.  Are you talking about July 24 -- one?
19      Q.  July 21, 2014, on almost every page of all these
20  organizational charts?
21      A.  Again, as I said earlier, this is a work in
22  progress.  It's been evolving.  And so at that point in time
23  it was just a snapshot of what things might look like and
24  where people were going to be.
25          Now obviously you don't come up to July 21st and

109

1  that's when -- there's a lot of discussions that preceded
2  that leading to the evolution of what you see here.
3          And again, this has even evolved since that time.
4      Q.  So then it would be correct to state that the
5  memorandum that we labeled marked as Exhibit 16, which is
6  the memorandum that came out of your office announcing
7  short-term changes, so those were changes that were just the
8  way you viewed it but it was still going to be a work in
9  progress?
10          That's what I'm not getting.
11      A.  So when I arrived -- this goes back to a much
12  larger issue, and so I'm glad to chat about that.
13          So when I first took over Pima Community College,
14  it was a college in major distress, and I underscore major.
15  And there's certain indicators that one just looking at the
16  organization could tell that something isn't right.
17          When you have 18, 17 people reporting to the
18  chancellor for a size of organization as Pima that right out
19  of the gate is a red flag.  So that's one piece.
20          There seemed to be when I look at the financial
21  side of the college a lot of resources not organized in a
22  way that I think makes sense for an institution of higher
23  education.  That's another red flag.
24          So and then I could go -- I mean go down the line.
25  I'm just giving you just a couple pieces; right?

LEE LAMBERT
4/28/2016

Page 114

1  Q. And Rachelle Howell also changed positions; right?
2  A. Yes. I believe that's correct.
3  Q. Why did you change her?
4  A. Say that again.
5  Q. Why did you, why did you accept a recommendation
6  to change her position?
7      MS. STATON: Object to the form.
8      THE WITNESS: So we started to, again, trying to
9  put the people on the right seat on the bus and because
10 Rachelle at one point in time in the history of the college
11 actually oversaw this whole area minus some of the new
12 pieces, so she was, my understanding, C.J. before C.J. came
13 onboard. Okay. So she was the vice chancellor before.
14     She ends up going and overseeing grants. And so
15 we essentially took all those pieces and moved them over
16 into this, into this unit, if memory serves me correct.
17     So and I don't know how Zelema went about deciding
18 that move because Rachelle did not report to me so I was not
19 as directly involved in Rachelle's piece.
20     Why I was directly involved with C.J. because he
21 directly reported to me at one stage, so that's why I had a
22 little more understanding of that than I do what happened
23 with her.
24 Q. And again, in the case of Rachelle Pima Community
25 College offered her another position, you did not require

Page 115

1  her to apply for other positions; correct?
2  A. What position are you --
3      MS. STATON: Objection to form.
4  A. I'm sorry.
5      What position are you referring to?
6  Q. Well, when it was announced that Pima Community
7  College was making some changes in leadership, Rachelle
8  Howell was changed from one position, reassigned to another
9  position; correct?
10     MS. STATON: Object to the form, foundation.
11     THE WITNESS: You have to be clear about what
12 position you're talking about.
13 Q. Well, let's just --
14 A. Because Rachelle was over in grants. She ends up
15 being the acting vice chancellor for this entire area. So
16 that's why I'm asking you what position are you referring
17 to?
18 Q. Well, let me ask you this. Did you tell Rachelle
19 that she had to compete for any position?
20 A. She competed for the institutional advancement
21 vice chancellor position.
22 Q. Before that?
23 A. That was, again, that position did not report to
24 me, so I don't know what was told to her. So that's a
25 question for Zelema Harris.

Page 116

1  Q. Did you tell C.J. that he had to compete for the
2  lower position that he was assigned to?
3  A. Like I said earlier, I answered the question, he
4  was at this level and we took away duties from him but kept
5  it in the same employee group. Therefore, he did not have
6  to compete for that.
7  Q. Did you at any time consider reassigning
8  Ms. Imelda Cuyugan to another position, a lower position or
9  any position?
10    Did you look into all the orgs. and see if there's
11 any way you could have put her in another position?
12 A. What I recall is asking her to look at what the
13 options were at the college and then we would talk about how
14 we would approach that.
15    The position I recall her being interested in was
16 the vice chancellor position, which she had to apply and
17 compete for, just like Rachelle Howell had to apply and
18 compete for.
19 Q. Did you tell any other of your supervisees or at
20 the level of -- did you tell -- at that point, this is June
21 of 2014, while you were going through these changes did you
22 tell any other employee besides Imelda Cuyugan your position
23 is going to be eliminated, you are welcome to apply for any
24 other positions available?
25 A. Folks who had reported to me?

Page 117

1  Q. To you or to Dr. Harris?
2  A. I can't speak to the folks who reported to
3  Dr. Harris that did not at one point report to me.
4      And so out of the people who reported to me, which
5  Imelda was one of them, she was the only one of that group
6  that at that stage in time that I said we're going to give
7  you a shorter contract.
8  Q. And you also told her that she had to apply -- she
9  could apply for any positions she was interested in;
10 correct?
11 A. I said she could apply if it's opened up for that
12 purpose.
13 Q. Did you tell any other employee that reported to
14 you that?
15 A. I did not make these same kind of moves at that
16 time with those individuals.
17 Q. So the college continued evolving?
18 A. Yes.
19 Q. And in 2014 it seems that someone came up with the
20 idea of creating the position for executive director for
21 media, community and government relations.
22     Did that ever happen?
23 A. I don't understand what you're asking me.
24     (Whereupon Deposition Exhibit Number 20 was marked
25 for identification.)

LEE LAMBERT
4/28/2016

146

1  distinction that you're drawing. She recommended that we
2  needed to reorganize, that we didn't need somebody --
3         MS. STATON: You need to talk up a little bit
4  more.
5         THE WITNESS: -- she recommended we didn't need
6  somebody internally to handle that state and local piece in
7  the same way that it was being done.
8      Q. Did she recommend to you that the position of
9  Imelda Cuyugan be eliminated?
10     A. I just answered the question.
11        MS. STATON: Object to the form.
12     Answer.
13     A. I just answered the question.
14     Q. Did she say to you we need to eliminate, terminate
15  Imelda Cuyugan?
16        MS. STATON: Object to the form, foundation.
17        THE WITNESS: I don't recall her saying that in
18  terms of your client specifically.
19     Q. Based on the recommendations of Dr. Harris were
20  you still -- would you still be able -- let's strike all of
21  this.
22     The truth is you had the authority to place
23  Ms. Cuyugan in another position where her skills could be
24  used; correct?
25        MS. STATON: Object to the form.

147

1         THE WITNESS: I have the authority as it's
2  delegated to me by the Board of Governors, yes.
3      Q. So you could have looked at her skills and see
4  where you could have placed her within the institution after
5  her department was eliminated; correct?
6         MS. STATON: Object to the form and foundation.
7         THE WITNESS: I, I wouldn't frame the question the
8  way you did, but I have the authority to place folks
9  directly if I so choose.
10        I do not like to exercise that authority when it
11  comes to permanent or regular appointments, especially if
12  it's going to cross into other employee groups.
13        So in other words, I'm not going to go from an
14  administrator to a faculty or administrator to staff
15  position. Now there may be times when that would make sense
16  to do that, but I don't just do that lightly.
17     Q. So why is it that Imelda Cuyugan was not placed
18  within the organizational charts in a position just handling
19  state and federal government affairs?
20        MS. STATON: Object to the form, foundation.
21        THE WITNESS: Like I mentioned earlier, we had
22  somebody still in that line tied to the federal piece, and
23  so we did not fully make the complete integration at that
24  point.
25        Also, I wanted to bring in a lobbyist who had

148

1  better connections and understandings of what goes on in
2  Phoenix. So there was no position to move your client into
3  tied to that area.
4      Q. And you were the person that made the decision to
5  give Ms. Cuyugan a three month contract; correct?
6      A. Yes.
7      Q. You could have also made the decision to give her
8  a one year contract; correct?
9         MS. STATON: Object to the form and foundation.
10        THE WITNESS: I have the authority that the board
11  delegated to me or authorized me to offer anybody on that
12  list up to a full year contract.
13     Q. When you made the determination to give
14  Ms. Cuyugan a three month contract, did you take into
15  consideration in any way her performance?
16        Like when you made the decision to eliminate and
17  just say we're not renewing your contract for next year,
18  what did you base that decision on?
19        MS. STATON: Object to the form, asked and
20  answered.
21        THE WITNESS: First of all, I've already answered
22  your question. I did offer your client a contract. It was
23  a three month contract, not a 12 month contract. So it's
24  misleading to say I didn't offer her a contract first.
25        Secondly, looking at the range of options I did

149

1  not feel that I had a position that I could just offer to
2  your client at that time. So I said to her let's look at
3  what's out there. And then she chose to apply for a
4  position that was one level up. Unfortunately, she was not
5  the successful individual for that position.
6      Q. The fact that Ms. Imelda Cuyugan is no longer
7  working for Pima Community College was her performance in
8  any way related to Ms. Cuyugan not being at Pima Community
9  College today?
10        MS. STATON: Object to the form, asked and
11  answered.
12        THE WITNESS: As I said to you earlier, this
13  decision was not tied to her performance.
14     Q. Was the decision in any way based on her
15  competency?
16        MS. STATON: Same objection.
17        THE WITNESS: I would see competency and
18  performance interrelated. Therefore, that was not a factor
19  in the decision making process.
20     Q. Did any allegations or any investigations related
21  to an event -- as you were aware, there was a complaint
22  filed by an anonymous individual called something like
23  Makabayan?
24     A. Something along that lines.
25     Q. Correct?

RAYNBO COURT REPORTING, LTD.