EXHIBIT 3

Deposition of Zelema Harris

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


IMELDA CUYUGAN,                        )
                                       )
                    Plaintiff,         )
                                       )
         vs.                           )   No. 4:15-cv-00260-RCC
                                       )
PIMA COMMUNITY COLLEGE DISTRICT,       )
LEE LAMBERT, in his personal           )
capacity,                              )
                                       )
                    Defendants.        )
_____)




DEPOSITION OF ZELEMA HARRIS

Tucson, Arizona

April 19, 2016




CERTIFIED COPY




RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
520/744-2293


Reported by:   Raynbo Silva, RPR, CR
               Certified Reporter No. 50014

ZELEMA HARRIS
4/19/2016

6

1    Q. What was the fellowship on?
2    A. It was in the field of education.
3    Q. Any other degree that you pursued?
4    A. After the master's I pursued the doctorate in
5  education at the University of Kansas.
6    Q. Do you remember more or less the year?
7    A. Yes. 1976 I received the degree.
8    Q. That's wonderful.
9       I'm assuming that is the highest you can obtain;
10  right?  The Ph.D. is the last degree that you obtained?
11  Because I don't think there's anything after that.
12    A. Yes. Yes.
13    Q. So tell me then a little bit about your work
14  experience.  Let's go after you obtained your Ph.D. Where
15  did you work after you obtained the Ph.D.?
16    A. I worked at the University of Kansas. I was an
17  assistant director of their college for liberal arts and
18  sciences.  And let me back up.  That was during the time I
19  was working on my degree.
20       Once I received the degree I worked at
21  Metropolitan Community Colleges in Kansas City, Missouri.
22    Q. After the Metropolitan College where did you work?
23    A. Parkland College in Champaign, Illinois.
24    Q. And after Champaign, Illinois?
25    A. St. Louis Community College District.

7

1    Q. How long did you stay at St. Louis Community
2  District?
3    A. Four years.
4    Q. And after that?
5    A. I was retired before I went to St. Louis. I went
6  there in an interim position.  And after that I remained
7  retired until I received a call to consider coming here to
8  help the college to deal with some of the issues they faced
9  after the chancellor retired from Pima Community College
10  District.
11    Q. Where did you spend most of your career?  Was that
12  at the Metropolitan?
13    A. I was at Metropolitan 14 years.  I was in
14  Champaign 16 at Parkland College where I served as
15  president.  And I retired there in 2006.
16    Q. So you mentioned after you retired from St. Louis
17  Community College did you -- my true question is how did
18  you -- what made you move to Tucson?
19    A. I moved to Tucson in April of 2013 and assumed the
20  position April 15th, 2015, through June 30th, 2013.
21       MS. STATON: I think you misspoke so.
22    Q. I think you -- yes.  So you moved to Tucson in
23  April of 2013?
24    A. Uh-huh.
25    Q. And then you stayed until June of 2013; would that

8

1  be correct?
2    A. Yes.
3       MS. STATON: For two months?
4    A. Two and a half months.
5       MS. STATON: There you go.
6    Q. So you came to Tucson for two and a half months?
7    A. As an interim chancellor.
8    Q. I get what you're saying now.
9       So going back for a moment, you mentioned you
10  received a call?
11    A. Yes.
12    Q. Did you receive a call when you were in St. Louis?
13    A. No. I was in Illinois. I had retired, and the
14  consultant working with Pima called me.
15    Q. Who was that?
16    A. Narcisa Polonio.
17    Q. Would you mind spelling that for us?
18    A. N-A-R-C-I-S-A P-O-L-I-N-O. I may have her number.
19  I can give you the definite spelling from my contact list.
20  P-O-L-O-N-I-O, I believe.
21    Q. So this person is it a she or a he?
22    A. A she.
23    Q. A she.  She as a consultant of Pima Community
24  College called you?
25    A. Yes.

9

1    Q. While you were retired in Illinois?
2    A. Yes.
3    Q. So what did this person tell you?
4    A. She asked if I would be willing to come here to
5  serve as interim chancellor until the search for a new
6  chancellor was finalized.  And after some discussion and
7  reading information that she had sent to me I said yes.
8    Q. What type of information did she send you?
9    A. All of the news articles about what had occurred
10  during the Flores administration.
11    Q. And what were the articles about?
12    A. The sexual harassment charges mainly that were
13  leveled against the chancellor at that time.  Well, he was
14  no longer there but Chancellor Flores.
15    Q. So what position did they offer?
16    A. It was the interim chancellor's position.  And the
17  idea -- yeah, it was interim chancellor.
18    Q. And what was the idea?
19    A. To remain there in the position until the new
20  chancellor was hired.
21    Q. So was Suzanne Miles already gone, too, when you
22  arrived?
23    A. Yes.
24    Q. And when did you first arrive at Pima Community
25  College?

ZELEMA HARRIS
4/19/2016

---

26

1    Q.  Based on your interactions with Ms. Cuyugan did
2  you believe Ms. Cuyugan to be competent?
3    **A.  She was learning her role, and she was capable I**
4  **think of doing the job.**
5    Q.  Did you believe based on your experience
6  Ms. Cuyugan to be intelligent?
7    **A.  Yes.**
8    Q.  Competent?
9        MS. STATON:  Object to the form, asked and
10  answered.
11       THE WITNESS:  When you say competent, then I'm
12  applying that to a specific role.
13    Q.  Was Ms. Cuyugan a good lobbyist?
14       MS. STATON:  Object to the form, foundation.
15       THE WITNESS:  I think she was learning her role.
16    Q.  If in the assessment form of an administrator the
17  administrator evaluated or described him or herself in a way
18  that you did not agree, would you change that?
19       MS. STATON:  Object to the form of the question.
20       THE WITNESS:  In the early stages of the
21  evaluation and the way it was constructed I probably would
22  not change the self-assessment.
23    Q.  So if you read something that you believe strongly
24  you did not agree with, are you telling me that you would
25  have just left it that way?

---

27

1    **A.  No.  Not if I strongly disagreed I would not.**
2       (Whereupon Deposition Exhibit Number 2 was marked
3  for identification.)
4    Q.  I am showing you, Dr. Harris, an evaluation where
5  it's the correct name would be annual leadership assessment
6  form of Ms. Imelda Cuyugan.
7       And if you go to the -- to what has been labeled
8  PCC000119, being the last page, do you recognize your
9  signature on page 5 of that document?
10    **A.  Yes.**
11    Q.  So you would be the assessor of Ms. Cuyugan's
12  performance for the period 2013-2014; correct?
13       MS. STATON:  Object to the form.
14       THE WITNESS:  No.  This assessment period was
15  December to February.
16    Q.  Okay.  So December of 2013 to February of 2014;
17  correct?
18    **A.  Yes.**
19    Q.  A P underneath assessment would constitute being
20  proficient; correct?
21    **A.  Yes.**
22    Q.  And an ADV would constitute a person being
23  advanced; correct?
24    **A.  Yes.**
25    Q.  Above that of proficient level.

---

28

1       And according to this assessment Ms. Cuyugan
2  assessed herself as being proficient or above that of a
3  proficient level, and you agreed with that; correct?
4    **A.  Yes.**
5    Q.  According to this assessment Ms. Cuyugan was able
6  to reinstate $4.5 million in state matching funds for the
7  adult basic education after a five year zero match?
8       MS. STATON:  Where are you reading?
9       MS. BONILLA:  PCC000116.
10       MS. STATON:  Okay.  Let her find it.
11       MS. BONILLA:  So that would be the second page
12  under employee comments.
13       MS. STATON:  It's down here.
14    Q.  The first bullet under employee's comments at the
15  end of that page, do you see that?  It starts with provided?
16    **A.  Yes.**
17    Q.  So she was able to reinstate $4.5 million in state
18  matching funds.  Would that be an accurate statement?
19       MS. STATON:  Object to the form.  Lacks
20  foundation.
21       THE WITNESS:  I cannot -- I have no factual
22  evidence that she did that alone.  That was a statewide
23  initiative among all community colleges to restore funding
24  and there were others working on this, but I have no
25  concrete evidence that this was the handiwork of Mrs.,

---

29

1  Ms. Cuyugan.  That was a collective effort I believe on the
2  part of the state.
3    Q.  On behalf of the state or on behalf of the
4  individuals from each community college that were --
5    **A.  Each --**
6    Q.  -- advocating for it?
7    **A.  Each community college that was advocating.  And I**
8  **refer to them as state community college system.**
9    Q.  And Ms. Cuyugan was the one lobbying for that on
10  behalf of Pima Community College; correct?
11       MS. STATON:  Object to the form, lacks foundation.
12       THE WITNESS:  I believe so.
13    Q.  So would it be correct to state that Ms. Cuyugan
14  advocated for an effort that resulted in the reinstatement
15  of a $4.5 million state matching to Pima Community College?
16       MS. STATON:  Object to the form, lacks foundation.
17       THE WITNESS:  I'm sorry.  I didn't understand the
18  question.
19    Q.  Would it be correct to state that Ms. Cuyugan
20  advocated for an effort that resulted in the reinstatement
21  of a $4.5 million state matching of funds to Pima Community
22  College?
23       MS. STATON:  Same objection.
24       THE WITNESS:  Yes.
25    Q.  At the end of the period that you eval --

---

ZELEMA HARRIS
4/19/2016

---

30

1 throughout the time that you evaluated Ms. Cuyugan can you
2 conclude that she was proficient at advocating for Pima
3 Community College in obtaining funds and lobbying for the
4 college?
5        MS. STATON:  Object to the form, foundation.
6        THE WITNESS:  I don't know.
7    Q.  Based on the time that you evaluated Ms. Cuyugan's
8 performance, Dr. Harris, do you believe Ms. Cuyugan was a
9 good advocate for Pima Community College?
10       MS. STATON:  Object to the form, foundation.
11       THE WITNESS:  I don't have any concrete evidence,
12 but I believe she was an advocate for the college.
13   Q.  Based on your experience, vast experience with
14 community colleges, do you believe that a community college
15 is better off with someone internally advocating for the
16 college as a lobbyist versus an external lobbyist that you
17 hire as a lobbyist?
18       MS. STATON:  Object, foundation.
19       THE WITNESS:  Based on my experience I think it
20 depends on the community college itself and its relationship
21 to the legislature and the community.
22   Q.  I'm sorry.  The legislation and?
23   A.  The community.
24   Q.  Okay.
25   A.  So I don't have a prototype that I would overlay

---

31

1 over Pima, but assessing what was going on at Pima I would
2 say that I felt it would work better and we would be more
3 nimble if we were to contract lobbying out and that was my
4 personal and professional recommendation.
5    Q.  Are you aware that Pima Community College had
6 lobbyists that were contracted out before Imelda became the
7 assistant vice chancellor?
8        MS. STATON:  Objection, foundation.
9        THE WITNESS:  Yes.
10   Q.  Did you evaluate how that worked before?
11       MS. STATON:  Objection, form.
12       THE WITNESS:  Yes.
13   Q.  Did you conclude that the lobbyists that were
14 hired by Pima Community College were doing way better than
15 when it was being advocated from the inside with an
16 administrator?
17       MS. STATON:  Object to the form.
18       THE WITNESS:  I concluded -- let's see.  Would you
19 restate your question, please?
20   Q.  When you evaluated the fact that before Imelda
21 Cuyugan was in the position of assistant vice chancellor of
22 state governmental relations, there were lobbyists that were
23 hired to represent Pima Community College.
24       So I'm assuming you evaluated what those lobbyists
25 did for Pima Community College before Imelda was lobbying

---

32

1 for the college; correct?
2        MS. STATON:  Object to the form, lacks foundation.
3        THE WITNESS:  I would need clarification on
4 Imelda's role before we hired the lobbyist before I can
5 really answer your question.
6        But based on what I know Imelda was already in
7 that role while we paid a lobbyist about 60,000 a year, and
8 the recommendation to maintain that position was not
9 approved by me because I felt that Imelda should be given
10 the opportunity to do the work.  And we had two people doing
11 the work, the lobbyist and Imelda.
12       And when I met with the two of them, the meeting
13 was with Imelda, and she wanted me to meet the lobbyist, and
14 she was not aware I did not feel of the issues that the
15 lobbyist was aware of.
16   Q.  What do you mean about I did not feel of the
17 issues that the lobbyist was aware of?
18   A.  The lobbyist talked about all of the bills, what
19 was going on with the community college system, what the
20 parties were.  And each time, as I recall, when I asked a
21 question of Imelda the lobbyist answered.  And to be
22 effective as a lobbyist this is her role.  She was the
23 leader, as I saw it, and yet the lobbyist assumed all of the
24 responsibility seemingly in that one meeting.
25       That was my assessment that we should not contract

---

33

1 with him to allow Imelda to do her work.
2    Q.  Who was that lobbyist?
3    A.  I don't recall his name.
4    Q.  It was a man?
5    A.  Yes.
6    Q.  So based on those interactions you concluded that
7 the college was better off Imelda doing the work versus
8 having and paying for that lobbyist; correct?
9    A.  Yes.
10   Q.  And I'm sure part of that decision was based on
11 why pay a lobbyist when we have Imelda Cuyugan in her
12 position; correct?
13       MS. STATON:  Object to the form, foundation.
14       THE WITNESS:  I think my rationale was to give her
15 the opportunity.  I wasn't sure she could do the work, but
16 certainly if she had the responsibility it would give her a
17 chance to prove herself.
18   Q.  Do you remember more or less when you made that
19 decision?
20   A.  It had to be during the time I served as interim
21 chancellor.
22   Q.  And what would be that period of time?
23   A.  April 15th to June 30th of 2013.
24       (Whereupon Deposition Exhibit Number 3 was marked
25 for identification.)

---

RAYNBO COURT REPORTING, LTD.

ZELEMA HARRIS
4/19/2016

34

1    Q.  I'm showing you what has been marked as Exhibit 3,
2  and it's an e-mail dated December 17th, 2013.
3         Well, we would need to -- with e-mails, as you
4  know, we need to go to the origin --
5    A.  Right.
6    Q.  -- to the first e-mail, and that would be on
7  page 2.
8         It starts with an e-mail that Cassie Gannon sent
9  to Ms. Cuyugan, and then Ms. Cuyugan on December 9 sends an
10  e-mail to Chancellor Lambert explaining -- can you -- I
11  think you're in a better position to explain to us what this
12  is about, if you remember.
13    A.  I don't remember, but I do recall that I was very
14  pleased with the way in which she pulled the people together
15  to meet with Lee. And yeah, I felt very good about what she
16  had done.
17    Q.  So this is December of 2013?
18    A.  Yes.
19    Q.  And Chancellor Lambert wrote thanks, Imelda, great
20  work; correct?
21    A.  Yes.
22    Q.  And then you write, Imelda, you are making me
23  proud, keep up the good work, I would like for you to assist
24  me with planning when you're in town, Zelema.
25         Correct?

35

1    A.  Yes.
2    Q.  So this is an example of how you and Chancellor
3  Lambert were very pleased with the way she dealt with an
4  aspect having to do with her role as assistant vice
5  chancellor of state government relations; correct?
6         MS. STATON:  Object to the form.
7         THE WITNESS:  I think it speaks to this one
8  example of the work she was doing.
9    Q.  And when you say keep up the good work, we would
10  need to assume that she was already doing good work and you
11  just wanted her to keep up the good work; correct?
12         MS. STATON:  Object to the form, foundation.
13         THE WITNESS:  No.  I meant keep up the good work
14  she did in this instance.
15         MS. STATON:  When you get to a point, we've been
16  going a little over an hour, it's your call.
17         MS. BONILLA:  Sure.  This is a good time.
18         (Whereupon a recess was taken from 10:42 A.M. to
19  10:54 A.M.)
20    Q.  Back on the record.
21         Dr. Harris, would you say that the personnel
22  policies of community college are similar based on your
23  experience or are they very different?
24         MS. STATON:  Object to the form, lacks foundation.
25         THE WITNESS:  I think there are some commonalities

36

1  with all personnel policies, whether they're at a community
2  college or a business.  So the answer I guess is there are
3  similarities and there are differences.
4    Q.  Who has the final authority to make decisions
5  regarding personnel at a community college?
6    A.  The chance --
7         MS. STATON:  I'll object to form.
8         No.  Go ahead.  Go ahead and answer.
9         THE WITNESS:  The chance -- the board, actually.
10    Q.  Thank you.
11         And if we go back to your work experience, how
12  many years have you worked with community colleges total?
13    A.  I think about 37 --
14    Q.  That would be --
15    A.  -- approximately.
16    Q.  That would be more years than Chancellor Lambert
17  has worked with community colleges; correct?
18         MS. STATON:  Object --
19         THE WITNESS:  It's more years than most people.
20    Q.  And most of your work experience has been with
21  community colleges; right?  That has been the vast --
22    A.  Yes.
23    Q.  -- the majority of your years of experience;
24  correct?
25    A.  Correct.

37

1    Q.  And that is what you concentrate, have
2  concentrated on community college and that's it; correct?
3    A.  That's where my vast experience has been.
4         (Whereupon Deposition Exhibit Number 4 was marked
5  for identification.)
6    Q.  I will ask you to please -- well, first what I'm
7  showing you is the administrative personnel policy statement
8  adopted by the Board of Governors of Pima County Community
9  College for 2013-2014.
10         Do you recognize that document?
11    A.  No.
12    Q.  You have never seen this document?
13    A.  I do not recall.  I've seen a lot of documents,
14  and I'm pretty sure I was given a copy, but I do not recall.
15    Q.  So what I'm going to ask you then to read part of
16  this -- do you have any reason to believe that this would
17  not be the policy statement from Pima Community College
18  regarding administrative personnel?
19         MS. STATON:  Let me object to the form.
20         THE WITNESS:  No.
21    Q.  So I'm just going to ask you your opinion about
22  something based on your experience.
23         So if you go to page 2 under offer of new contract
24  all the way to the end it says, an administrator and/or
25  executive administrator, other than the position of

ZELEMA HARRIS
4/19/2016

38

1  chancellor, will be offered any contract for the ensuing
2  fiscal year unless he or she is otherwise notified in
3  writing on or before February 15.
4      Is this a pretty typical policy of a higher
5  education organization?
6      MS. STATON:  Object to the form, foundation.
7      THE WITNESS:  Yes.
8      Q.  Independently of the date would you, based on your
9  experience, conclude that if an administrator by the date
10 that is stated here, February 15, is not notified that they
11 will not get, that they will not get a new contract, would
12 it be reasonable for the administrator to believe that they
13 will get a new contract for the next fiscal year?
14     MS. STATON:  Object to the form, foundation, calls
15 for a legal conclusion.
16     Q.  You can go ahead and answer.
17     A.  As an at will employee -- I will use a different
18 term.  As an administrator, if you had been getting a new
19 contract every year, it is reasonable to assume that it will
20 continue if you've not been notified.
21     Q.  In your prior positions as president of a former,
22 former president of a community college, if you were not
23 going to renew the position of an administrator, would you
24 notify them within the timeline established under the
25 personnel policy?

39

1      A.  Could you repeat it?  It's a little --
2      Q.  Go ahead.  I understand.
3      A.  Yeah.  Yeah.
4      Q.  When you were in your position before as president
5  of a community college if you were not going to renew the
6  contract of an administrator, for example, would you need to
7  follow policy as to notify within the timeline established
8  under the policy applicable to that community college?
9      MS. STATON:  Object to the form.
10     THE WITNESS:  You would assume -- I'm sorry.  I
11 keep getting the question -- one would expect to follow the
12 employment policy.
13     Q.  Based on what we have read to be the policy of
14 Pima Community College --
15     MS. STATON:  Go ahead.
16     Q.  -- would it be reasonable for Ms. Cuyugan to have
17 the expectation that she would get an employment contract
18 for the following year if she was not notified by
19 February 15 that her contract was not -- if she was not
20 notified that it would not be renewed?
21     MS. STATON:  Object to the form, foundation, calls
22 for a legal conclusion.
23     THE WITNESS:  I believe she would have expected to
24 receive a contract if she had not been notified by the date
25 of February 15.

40

1      (Whereupon Deposition Exhibit Number 5 was marked
2  for identification.)
3      Q.  So I am showing you what is titled an action item
4  of a meeting on March 12th, 2014; correct?
5      A.  Yes.
6      Q.  As of March 12th, 2014, you were -- what was your
7  position at Pima Community College?
8      A.  I was still the executive vice chancellor of
9  institutional effectiveness and acting or interim provost.
10     Q.  And I would like you to please refer to page 1 and
11 page 2 of that document which is what we will be discussing.
12     The first paragraph, would you mind reading for us
13 what the recommendation is, first page?
14     MS. STATON:  Do you want her to read it out loud?
15     Q.  If you don't mind.
16     A.  The chancellor recommends the Board of Governors
17 approve the following administrator regular appointments for
18 the fiscal year 2014-2015.  Furthermore the chancellor
19 recommends the board authorize the chancellor or designee to
20 sign employment contracts for administrative personnel on
21 behalf of the college district.
22     Q.  Just so we can help each other, I want the record
23 to be clear, I will read the background.
24     A.  Oh, you want to read it?
25     Q.  I just want the record to be clear as to what it

41

1  states --
2      A.  Okay.
3      Q.  -- and then I'll ask you the questions.
4      Contracts for administrators are normally prepared
5  for one fiscal year but may in some circumstances be for a
6  shorter period of time.  In accordance with board policy an
7  administrator shall be offered a new contract for the
8  ensuing fiscal year unless he or she is otherwise notified
9  in writing on or before February 15.  This list is current
10 as of the date submitted.  However, additional names may be
11 presented to the board at a later date.
12     It is essential to clarify while the appointment
13 of each administrator may be for the full fiscal year, his
14 or her assignment may be changed during the course of the
15 year in accordance with the applicable board policy.  The
16 administrators listed on the attached pages are recommended
17 for a regular appointment for fiscal 2014-2015.
18     Correct?
19     A.  Yes.
20     Q.  Then you see the list on the second page.
21     And based on what we just read, Dr. Harris, what
22 is your understanding of what the chancellor is recommending
23 the board to approve?
24     MS. STATON:  Object to the form, foundation.
25     THE WITNESS:  He is recommending to the board that

ZELEMA HARRIS
4/19/2016

42

1  a contract be approved for Imelda.
2      Q.  For what?  A contract for what?
3      A.  Fiscal year 2014-2015.
4      Q.  Based on what you've read would that be a contract
5  for the full fiscal year, Dr. Harris?
6          MS. STATON:  Object to the form, foundation.
7          THE WITNESS:  I don't know.  I don't know.  It
8  states it can be for a shorter period of time, but this is
9  clear that it's for 2014-2015.  That's my, my belief.  I
10  don't --
11     Q.  So for me to make sure I'm understanding you
12  correctly, your belief is that even though it states that in
13  some circumstances it may be for a shorter period of time
14  what this is stating is that these administrators are
15  recommended for a regular appointment of the full fiscal
16  year of 2014-2015; correct?
17         MS. STATON:  Object to the form, lacks foundation.
18         THE WITNESS:  Yes.
19     Q.  Then if we go to the notice and the agenda, it
20  seems that -- well, this is the agenda.  Let's go to the --
21  it's a very long agenda.
22         If we go to the actual meeting, which starts at
23  PCC000240, it seems that you were in attendance at that
24  meeting; correct?
25     A.  Yes.

43

1      Q.  And if we go to the action items and we go to page
2  what has been labeled PCC000245, and it would be Motion
3  Number 201403-03.  Do you see that?
4      A.  That's 245?
5          MS. STATON:  She's talking about that right there.
6      Q.  Motion Number --
7      A.  Oh, motion number.
8      Q.  -- 201403-03, do you see that?
9      A.  Yes.
10     Q.  And that is the motion for the appointments that
11  we were just discussing where the board approved the
12  appointment of the administrators listed including Imelda
13  Cuyugan; correct?
14         MS. STATON:  Object to the form.
15         THE WITNESS:  Yes.
16     Q.  So this would mean, Dr. Harris, that Chancellor
17  Lambert recommended to the board that they approve the
18  appointment of Imelda Cuyugan for fiscal year 2014-2014 --
19  2014-2015; correct?
20         MS. STATON:  Object to the form, foundation.
21         THE WITNESS:  Yes.
22     Q.  And the board approved that recommendation;
23  correct?
24         MS. STATON:  Objection, form and foundation.
25         THE WITNESS:  Yes.

44

1      Q.  Dr. Harris, when is it that the idea or
2  possibility of terminating Ms. Cuyugan from her position was
3  ever discussed?
4          MS. STATON:  Object to the form.  Misstates the
5  evidence, foundation.
6          THE WITNESS:  There was never any discussion about
7  terminating Imelda Cuyugan.
8      Q.  So what was -- how did the idea of Ms. Cuyugan not
9  being at the college at some point when was it ever
10  discussed?
11     A.  The recommendation to reorganize all of the
12  functions that deal with community outreach, marketing,
13  public relations, I had been in the process of reviewing
14  that area for some time.
15         The recommendation was not presented to the
16  chancellor until after the board had met and acted on what
17  is the personnel report which includes all these folk who
18  were recommended to be hired.
19         So I had been working on the recommendation for
20  some time to figure out how we could be more effective both
21  cost-wise and quality-wise in meeting the needs of the
22  college and the community.
23         It was my recommendation to the executive
24  committee during a meeting with Lee Lambert.  I presented
25  the recommendation to the group.  And the chancellor asked,

45

1  he did not see Imelda as part of that recommendation, and he
2  asked what's going to happen to Imelda?
3          And I probably said something like we are
4  recommending that that office be eliminated and therefore
5  she would have the opportunity to look for other jobs here
6  at the college.
7      Q.  You said that you had been working on -- let's go
8  back.
9          Who asked you to make any recommendations
10  regarding some type of restructuring?
11     A.  Along with that area I was looking -- I was
12  working on restructuring student services, developmental
13  education.  I saw it as part of my responsibility, and I had
14  the responsibility for foundation as well.  And in my
15  discussions with the chancellor these were areas under my
16  areas of responsibility.
17         So just give me a minute to recollect meetings
18  that I had with him.
19         I don't recall if I said to him these are the
20  areas I am working on restructuring or if he asked me to
21  restructure a particular area, which was normally not his
22  way of working with me.
23     Q.  So basically what I'm understanding, I just want
24  to clarify, you don't remember if he asked you I want you to
25  do X or Y or whether you decided on your own let me see how

RAYNBO COURT REPORTING, LTD.

ZELEMA HARRIS
4/19/2016

46

1  I can make some changes?
2      A.  No.  We knew the problems.  They had all been
3  identified by the HLC and my own observations and experience
4  and we had many units that were not connected.
5          We had the media, public relations, printing,
6  state lobbying.  Federal lobbying was a totally separate
7  area.  So it was -- I saw my role as bringing all of those
8  units together and to present a cohesive unit that would be
9  able to respond to the needs of the community and to
10  outsource the lobbying effort.
11      Q.  So was that -- did you create any documents when
12  you were brainstorming about it?
13      A.  Yes.  The group that worked on it I gave them
14  sister institutions to look at, and I don't recall all of
15  them, but I know Cuyahoga was one.  So we looked at a number
16  of institutions and how they were organized.
17      Q.  Could you spell Cuyahoga for us?
18      A.  Cuyahoga, I can't remember.  It's in Ohio.  It's
19  Cuyahoga Community College.
20          There were many.  Not many, at least five that
21  were reviewed to see how they were organized.  And based on
22  reviewing that with the group working on it -- and the group
23  was led by I think it was Rachelle Howell, and I met with
24  them.  And I don't recall all the members.  I don't
25  recall -- yeah.

47

1          So it was my professional judgment that this
2  organization would work best for the college, and we were in
3  the throes of saving money so that we could invest in more
4  critical areas.
5      Q.  So what did you conclude?
6      A.  I concluded after a discussion with Imelda and the
7  chancellor -- the chancellor met with her to see how the
8  year had gone and how did she feel about her performance at
9  the state level.  I was in that meeting.  Normally if he met
10  with someone who reported to me, she was there to
11  communicate something but you work in a, as a team, and when
12  he asked her how did the year go at the state, I recall her
13  saying that she relied too much on the lobbyist from
14  Maricopa and that in the future she would not do that.
15          It was -- the lobbyist at Maricopa was highly
16  effective, well known.  I didn't know her, but this was what
17  I was told by both -- by Imelda.  And so I thought, well, if
18  Maricopa is representing us and essentially all community
19  colleges, then why are we -- why do we have this unit at
20  Pima?
21          And then secondly, we had engaged in contributing
22  to a lobbyist, it was my understanding, and that lobbyist
23  was working on behalf of all of the community colleges in
24  the State of Arizona.
25          So we had Maricopa, we had the lobbyist I believe

48

1  we were paying our fair share to represent us.  And it
2  seemed to me that the most effective way to utilize any
3  external lobbyist was to identify what that person was
4  supposed to work on and to let that lobbyist bird dog that
5  as opposed to having more people working in the field.
6          And that was my recommendation based on my
7  observations.
8      Q.  So what was your recommendation?
9          MS. STATON:  Objection, asked and answered.
10          She just told you.
11      Q.  Well --
12      A.  I made a complete recommendation that included a
13  number of functional areas --
14      Q.  Okay.
15      A.  -- and what I've just expressed was my
16  recommendation to the chancellor.
17      Q.  But the way you explain it was the big picture?
18      A.  Yes.
19      Q.  I would like to know what were your
20  recommendations, your practical recommendations, meaning to
21  specific positions.  Do you remember that?
22          MS. STATON:  Object to the form.
23          You mean as to Ms. Cuyugan?  Or --
24      Q.  What you remember your recommendations regarding
25  positions, like how did you restructure what departments and

49

1  what did you do --
2      A.  Yeah.
3      Q.  -- if you can remember?
4      A.  It was mostly big picture recommendation.  And
5  with respect to state lobbying, I made the recommendations
6  that I discussed, that the office be eliminated and that we
7  contract the work out when needed because we already had two
8  individuals representing us.  Even though Maricopa is huge,
9  they have their own people.  It seemed that the person that
10  Imelda shadowed, worked with from Maricopa represented all
11  of the community colleges.
12      Q.  Did you make specific recommendations as to each
13  employee that was in that department of state government
14  relations?
15      A.  I probably did, but I don't recall all of the
16  people.  I don't recall all of their names at this time.
17      Q.  Did you specifically state what to do with the
18  position of Imelda Cuyugan?
19          MS. STATON:  Objection, asked and answered.
20          THE WITNESS:  I recommended that that office be
21  eliminated.
22      Q.  So that's what you answered, and I completely
23  understand your answer.
24          One thing is the office, and one thing is the
25  persons in it.

ZELEMA HARRIS
4/19/2016

---

50

1       Did you make a specific recommendation as to each
2   person in that department?
3           MS. STATON: Objection, asked and answered.
4           THE WITNESS: I think I did, yeah.  When you
5   eliminate an office, then the people in it normally who are
6   doing the specific work of lobbying and that was my concern
7   is that we had -- we were duplicating services, and so I did
8   make that recommendation that her job be eliminated.
9       Q.  Did you take into consideration or did you ever
10  discuss the fact that she had already been approved by the
11  board for a contract for the fiscal year 2014-2015?
12          MS. STATON: Object to the form, foundation.
13          THE WITNESS: That was not something that I was to
14  deal with.  My job was to make recommendations.  When it
15  occurred, how it occurred is left up to H.R., the chancellor
16  and their recommendations to the board.
17      Q.  Did you make any specific recommendation as to
18  Michael Peel?
19      A.  Yes.  I recall that Michael's work was distinctly
20  different from lobbying.  The work he was doing, if I recall
21  correctly, would support the foundation to a greater extent
22  than the lobbying effort.
23          He was developing some type of an alumni base, I
24  believe, and I know the foundation needed more research.
25  And they were a part of the new unit that I was

---

51

1   recommending.
2       Q.  What do you mean by they were part?  Who's they?
3       A.  The foundation.
4       Q.  Which foundation?  I got lost.
5       A.  We have a foundation that raises money for the
6   college.
7       Q.  Okay.
8       A.  The Pima Community College Foundation.  I'm sorry.
9       Q.  Okay.
10      A.  I didn't make that clear.
11      Q.  So are you saying that Michael Peel worked for the
12  Pima Community College Foundation?
13      A.  I don't know where he was placed, but it was my
14  belief that the foundational piece, excluding foundation,
15  Pima Foundation, the research he was doing was going to be
16  very supportive of marketing, public relations and the
17  foundation.  So he was providing, based on what I saw, a
18  kind of research that that unit needed to be effective.
19      Q.  Did you give a recommendation as to where he
20  should, what position he should be placed in?
21      A.  I don't recall that I was that specific because I
22  was leaving soon after I made the recommendation and I was
23  busy trying to clear up a lot of things at the college.
24      I think I made the recommendation in June.
25      Q.  Did you make a specific recommendation as to where

---

52

1   C.J. Karamargin --
2       A.  Karamargin.
3       Q.  Karamargin.  Thank you.  I was very pleased to
4   know that Georgia was also having the same problems I had.
5           MS. STATON: It's an odd name.
6       Q.  It's a difficult one.
7           So we will refer to him as C.J.
8       A.  Yeah.
9       Q.  Did you make any specific recommendations as to
10  where C.J. would end up?
11      A.  Yes.  His position was reclassified based on the
12  research we had done, and he -- it was reclassified from
13  vice chancellor I think to some other level.  And to whom he
14  was to report, I don't recall making that decision, but I'm
15  sure it's somewhere on the chart.
16      Q.  When I requested information as to the
17  reorganization, I only received basically one document, and
18  I'm going to show you that document.  We're going to mark it
19  as an exhibit.
20          (Whereupon Deposition Exhibit Number 6 was marked
21  for identification.)
22      Q.  Do you recognize this document?
23      A.  Yes.
24      Q.  Who drafted this document?
25      A.  It probably was drafted by the public relations

---

53

1   office, and no doubt some of the information was taken from
2   the recommendations the chancellor received.
3       Q.  Did you provide your recommendations verbally or
4   in writing to the chancellor?
5       A.  I'm pretty sure they were in writing.
6       Q.  Besides providing recommendations in writing to
7   the counselor -- to the chancellor, I'm sorry, did you -- is
8   there a reorganization plan somewhere in writing?
9       A.  I believe so.  I think there was an org. chart,
10  yeah.
11      Q.  So basically your testimony is that you did put
12  your plan in writing, correct, making several
13  recommendations to the chancellor; correct?
14      A.  Yes.
15      Q.  And that this document it's not everything there
16  is regarding the plan to make several changes in a
17  reorganization; correct?
18      A.  I think you're right.  Correct.
19          MS. BONILLA: When I was reviewing the responses
20  to the request, I may be wrong, but this is what I obtained
21  regarding the reorganization.
22          MS. STATON: It's everything that I've got.
23          MS. BONILLA: It's everything you've got?
24          MS. STATON: Yeah.  I mean my understanding is, I
25  may have this wrong, but my understanding is that they went

---

ZELEMA HARRIS
4/19/2016

---

54

1 through changes in their systems, but whatever it is we
2 downloaded a bazillion documents, and we gave you
3 everything, and this is one of them.  So I've given you
4 everything that we've got.
5        MS. BONILLA:  Well, I don't know why this is all
6 I've seen regarding the reorganization.  So I'm receiving
7 information that it seems that there's way more regarding
8 the reorganization than this, and I just wanted to ask that
9 please check with the college.
10       MS. STATON:  I'll look again, but I don't -- I
11 haven't withheld anything, and they haven't withheld
12 anything, but I'll ask them again.
13       MS. BONILLA:  I'm sure you haven't.  I'm just
14 wondering if they have anything that they have not provided
15 you with.
16       MS. STATON:  I'll ask again.  This is all I've
17 got.
18       THE WITNESS:  I will note that in that same
19 recommendation, I believe, as is indicated here, I
20 recommended that my job be eliminated as well.
21    Q.  So from reading this my understanding is that the
22 only position that was -- no.
23       The position of C.J. was eliminated, too; correct?
24    A.  No.  It was not eliminated, no.
25    Q.  Was this -- go ahead.

---

55

1    A.  No.  It was not eliminated.  There was reduced
2 from vice chancellor to another level.
3    Q.  So basically public information and media
4 relations will be headed by executive director C.J.
5 Karamargin and marketing manager Paul Schwalbach?
6       MS. STATON:  Schwalbach.
7       THE WITNESS:  Schwalbach.
8    Q.  Thank you.
9       So what you're saying then is that you just
10 reduced his responsibilities?
11    A.  No.  His level.  Based on the study, the research
12 we did was at a higher level than what he was required to
13 do, so we made that change -- I made the recommendation
14 rather.
15    Q.  When you talk about research, what are you
16 referring to?
17       MS. STATON:  Objection, asked and answered.
18       THE WITNESS:  I'm sorry?
19    Q.  You said when we did the research, what research
20 are you referring to?
21    A.  When the committee worked on the reorg., the
22 reorganization.
23    Q.  Who was the committee?
24    A.  I think I said earlier I don't recall.  I believe
25 it was Rachelle Howell that led the effort, and there were

---

56

1 several institutions that we looked at.
2    Q.  So Rachelle Howard, I'm assuming yourself.
3       Do you remember anyone else being involved?
4    A.  I know C.J. was involved in looking at his area,
5 and it's interesting.  He acknowledged that his position and
6 what he was doing was at a higher level that it was at other
7 institutions.  I recall that because that's an unusual kind
8 of recommendation from a person.
9    Q.  Based on the time you spent with C.J. Karamargin,
10 what was your opinion as to his competency?
11       MS. STATON:  Object to the form, foundation.
12       THE WITNESS:  I don't think I should answer that
13 because I believe my evaluation was released to the media.
14 And so I don't, I don't think it's appropriate for me to
15 talk about another employee who is no longer with the
16 college.
17    Q.  Well, as part of the discovery I'm allowed to ask
18 questions and you're required to answer questions regarding
19 your knowledge --
20    A.  Okay.
21    Q.  -- unless your attorney instructs you that it
22 would be privileged.
23    A.  Okay.  Then I will answer.
24       He did some things very well, very well, and there
25 were others he did not do well.  And I think with his new

---

57

1 role he -- we were able to capture those things that he was
2 doing in a lower level job description.
3    Q.  In your position while you were at Pima Community
4 College as assistant --
5    A.  Whatever.
6    Q.  -- as executive vice president of institutional
7 effectiveness and interim provost --
8       MS. STATON:  Actually, it's actually assistant
9 vice chancellor, so it's not vice president.
10    Q.  I'm sorry.
11    A.  It was vice chancellor, executive vice chancellor.
12    Q.  I'm sorry.  I will make that clear.
13       MS. STATON:  I don't think it really matters, but
14 I'm just letting you know.
15       MS. BONILLA:  No.  Thank you.
16    Q.  As executive vice chancellor of institutional
17 effectiveness and interim provost you evaluated Imelda
18 Cuyugan and you evaluated C.J. Karamargin; right?
19    A.  Karamargin.
20    Q.  Karamargin; correct?
21    A.  Yes.
22    Q.  Based on your evaluation of both of them who was
23 doing a better job?
24       MS. STATON:  Object to the form, foundation.
25       THE WITNESS:  I think that's very difficult to

---

ZELEMA HARRIS
4/19/2016

---

62

1      Rachelle and C.J. retained positions at the
2  college; correct?
3      **A. I made that recommendation, yes.**
4      Q. So you made the specific recommendations that
5  Rachelle and C.J. be placed in another position at the
6  college?
7      MS. STATON: Object to the form, misstates her
8  testimony. Also lacks foundation.
9      Go ahead.
10     THE WITNESS: It was based on the qualifications
11  they have for that unit, yes.
12     Q. Did you make any suggestions as to where the
13  college could keep Ms. Cuyugan?
14     **A. No, I did not, but I believe, if I remember**
15  **correctly, when I made the recommendations to the chancellor**
16  **our H.R. director was there, and one of the things that the**
17  **chancellor always said we have enough positions here and we**
18  **really do want H.R. to work with each individual who has**
19  **either lost a job as a result of restructuring.**
20     **And I think that has occurred at the college. And**
21  **I'm not sure whether she met with anyone or not.**
22     Q. Did you ever have a conversation with Chancellor
23  Lambert regarding Imelda Cuyugan and whether to retain her
24  in any specific position?
25     **A. No.**

---

63

1      MS. STATON: Object, asked and answered.
2      **A. I'm sorry.**
3      MS. STATON: That's okay. Your answer stands.
4      **A. No.**
5      Q. Did you ever have a conversation with Chancellor
6  Lambert regarding Imelda Cuyugan's complaint of sexual
7  harassment against Ray Flores?
8      **A. No.**
9      Q. Did you ever have that conversation with anyone at
10  the college?
11     **A. I think I did with Jeff Silvyn. After meeting**
12  **with Imelda and she shared that I wanted to know if that**
13  **were a breach because I found that unusual to share that**
14  **with the new chancellor.**
15     Q. Did you reach a conclusion about that?
16     **A. No.**
17     Q. Can you share with me what you can remember about
18  your meeting with Ms. Cuyugan on June 13, 2014?
19     THE WITNESS: Do you want to give her some context?
20     THE WITNESS: What was the nature of the meeting?
21     Q. Dr. Harris, do you remember meeting with
22  Ms. Cuyugan and telling her that her contract for 2014-2015
23  would not be renewed?
24     **A. I don't know that I said that. I believe I said**
25  **her office was eliminated as it was currently operating.**

---

64

1  **But I don't -- if I did, it was certainly inaccurate because**
2  **it was after the deadline. So I don't recall saying her**
3  **contract would not be renewed, but there is a possibility**
4  **that I did. I don't know.**
5      Q. Do you believe Pima Community College had the
6  authority to not renew her contract for 2014-2015 after
7  February?
8      MS. STATON: Object to the form, foundation.
9  Calls for a legal conclusion.
10     THE WITNESS: I was going to say the same thing.
11  I think that is a legal issue because there are some
12  circumstances I believe where legal might say there is. I
13  don't know.
14     Q. Do you have -- okay.
15     So regarding that meeting that you had with
16  Ms. Cuyugan, do you remember saying that her department
17  would be eliminated?
18     MS. STATON: Object to form, asked and answered.
19     THE WITNESS: I don't remember exactly what was
20  said in the meeting. I must have written her, and whatever
21  I said -- I'm not really sure what I said in the meeting.
22  It was a -- yeah. I don't recall.
23     Q. What do you recall about -- let's strike that.
24     Do you remember the relationship between, anything
25  about the relationship between Imelda Cuyugan and C.J.?

---

65

1      MS. STATON: Object to the form, foundation.
2      THE WITNESS: No.
3      Q. Do you have any opinion as to whether they worked
4  well together or not?
5      MS. STATON: Same objection, foundation.
6      THE WITNESS: No.
7      Q. Do you have any idea who made a decision to give
8  Ms. Cuyugan a three month contract?
9      MS. STATON: I'm sorry. Could you read that?
10  Just I didn't hear the first part.
11     (Whereupon the record was read by the reporter as
12  follows:
13     "Q. Do you have any idea who made a decision
14  to give Ms. Cuyugan a three month contract?")
15     THE WITNESS: I believe the chancellor made that
16  decision.
17     Q. When you said that you recommended that Imelda
18  Cuyugan's department -- well, I shouldn't say that -- the
19  department of government, state government relations be
20  eliminated, you said that you didn't give any dates;
21  correct?
22     **A. No. I didn't say that. I said I don't recall.**
23  **Did I? Did I say I didn't give any dates?**
24     Q. When you made your recommendations to the
25  chancellor, did you provide timelines as to when the

---

ZELEMA HARRIS
4/19/2016

66

1  department should be eliminated or how?
2  **A.  I don't recall.**
3  Q.  Do you believe that in your reorganization and
4  what you recommended that Ms. Cuyugan and the department of
5  state government relations could continue for the 2014-2015
6  contract year, fiscal year?
7  MS. STATON:  Object to the form, foundation, also
8  calls for a legal conclusion.
9  THE WITNESS:  Could you repeat it?
10  Q.  Yes.  As part of your recommendations to the
11  reorganization, you suggested, you have stated that you
12  recommended that the department of state government
13  relations be eliminated; correct?
14  **A.  Yes.**
15  Q.  As part of your recommendation -- based on your
16  recommendation could that elimination take place for the
17  fiscal year 2015-2016?
18  MS. STATON:  Object to the form, foundation.
19  THE WITNESS:  I don't think that was my decision
20  to make.
21  Q.  So what I would like, what I'm asking you is did
22  you say my recommendation is for the department of state
23  government relations to be eliminated now --
24  MS. STATON:  Object to the form.
25  Q.  -- meaning June of 2014?

67

1  MS. STATON:  Object to the form.
2  THE WITNESS:  Generally changes occur at the
3  beginning of the fiscal year, which is July 1, so any
4  recommendation the assumption is it's going to be effective
5  July 1 of that year.
6  Q.  Did you provide dates?
7  **A.  I may have.  I'm just not really sure.  It would**
8  **seem that I would have said effective July 1, but I don't**
9  **know.  I don't recall.**
10  Q.  Were you at Pima Community College when
11  C.J. Karamargin stopped being an employee --
12  **A.  No.**
13  Q.  -- of Pima Community College?
14  **A.  No, I was not.**
15  Q.  Were you involved in any way in the decision to
16  give Ms. Cuyugan a three month contract for 2014-2015?
17  **A.  No, I was not.**
18  (Whereupon Deposition Exhibit Number 8 was marked
19  for identification.)
20  Q.  Have you had a chance to review this e-mail
21  thread?
22  **A.  Yes.**
23  Q.  So this is an exchange of e-mails basically
24  between Rachelle and you; correct?
25  **A.  Yes.**

68

1  Q.  And you're basically as of June 13, June 15, going
2  back and forth as to where to place employees in the
3  reorganization?
4  **A.  That was part of my recommendation.  That was part**
5  **of the new structure where I believe, if I recall correctly,**
6  **Rachelle was going to be the person responsible on an**
7  **interim basis so she assumed responsibility for questioning**
8  **some of those recommendations or some that had not been**
9  **solidified.**
10  Q.  But --
11  **A.  I worked until my last day, which was June 30th of**
12  **2014.  So yeah.**
13  Q.  So would it be then correct to state that when on
14  June 19th, 2014, notice was given to all Pima Community
15  College employees as to what would the changes be, would it
16  be correct to state that you and Rachelle were still working
17  on the details on where everyone would end up?
18  MS. STATON:  Object to the form.
19  THE WITNESS:  I would imagine that that probably
20  continued even after I left because the basic structure that
21  I recommended was going to pretty much remain intact.  It
22  was a matter of how to best utilize the people who were
23  left.  So yeah, we were last minute making some of those
24  adjustments.
25  (Whereupon Deposition Exhibit Number 9 was marked

69

1  for identification.)
2  (Whereupon a discussion was held off the record.)
3  Q.  So on June 23rd David you say Bea or Bea?  Bea?
4  MS. STATON:  Bea.
5  THE WITNESS:  Bea.
6  Q.  Bea.  On June 23rd, David Bea asked you is Imelda
7  going to be vacating her space, and if so, when?  I need to
8  move the records management person into an office and that
9  is a potential location that could work.
10  And you answer a deal was worked out with Lee and
11  she will stay three more months in her office.
12  How did you find out about the deal that was
13  worked out with Lee?
14  **A.  You know, I don't really recall, but -- I don't**
15  **recall.  I do know either someone told me.  It was not my**
16  **recommendation how long she would stay.**
17  **That was something I believe Ms. Cuyugan worked**
18  **out with Lee.  And normally in our -- in the way we write in**
19  **education at least a deal was worked out, it doesn't say who**
20  **worked it out.  And but the fact is that was something**
21  **Imelda worked out with Lee Lambert, I'm assuming.  But I was**
22  **not involved in that deal at all.**
23  (Whereupon Deposition Exhibit Number 10 was marked
24  for identification.)
25  MS. STATON:  What's the Bates Stamp on the next