EXHIBIT 4

Deposition of Michael Peel

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

IMELDA CUYUGAN,  )
 )
        Plaintiff,  )
 )
    vs.  )  No. 4:15-cv-00260-RCC
 )
PIMA COMMUNITY COLLEGE DISTRICT,  )
LEE LAMBERT, in his personal  )
capacity,  )
 )
        Defendants.  )
_____)

DEPOSITION OF MICHAEL PEEL

Tucson, Arizona

April 19, 2016

**CERTIFIED COPY**

RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
520/744-2293

Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

MICHAEL PEEL
4/19/2016

14

1  and a number of other individuals, I don't recall everybody.
2  I don't know if I've met everybody after that, so I don't
3  recall everybody.
4      Q.  Was it a large panel?
5      A.  No.  It was maybe five, I think, from what I can
6  recall.
7      Q.  After that interview did you have a second
8  interview?
9      A.  Yes.
10     Q.  Who was in that second interview?
11     A.  Dr. Harris, Dr. Zelema Harris.
12     Q.  Anyone else?
13     A.  Ms. Cuyugan.
14     Q.  Any other interview after that?
15     A.  There was no other interview after that.
16     Q.  Who offered you the position?
17     A.  I was offered the position by Dr. Harris a few
18 weeks later, the end of January --
19     Q.  How?
20     A.  -- 2014.
21        I was, I was given a call on the phone to let me
22 know that I would be -- I was, I was the successful
23 candidate and I would be followed up soon -- that would be
24 followed up soon with a letter from H.R., which was I think
25 within a week or so after that an official letter from H.R.

15

1  was sent to my e-mail.
2      Q.  Who called you?  Who called you to offer that?
3         MS. STATON:  Objection, asked and answered.
4         Go ahead and tell her.
5         THE WITNESS:  Dr. Zelema Harris called.
6      Q.  Okay.
7      A.  And then the e-mail was sent from H.R. a week
8  later or so, thereabouts.
9      Q.  What position was offered to you by Pima Community
10 College?
11     A.  The position of government relations advanced
12 analyst.
13     Q.  Did they explain to you what duties you would be
14 performing?
15     A.  Yes.
16     Q.  What were those?
17     A.  They included research on anything government
18 related, especially state and local government was the
19 focus, and in addition supporting Ms. Cuyugan with any
20 events that would be put on with legislators and supporting
21 legislative priorities and the lobbying work being done for
22 the college, and in addition, developing an advocacy
23 database called La Pima, was the name was that chosen to
24 develop this new database we had purchased for a grassroots
25 advocacy system for the City of Tucson to support the

16

1  college on its priorities.  And community members could join
2  that advocacy network online.
3      Q.  Do you know whose idea it was to acquire that
4  database?
5      A.  That was Ms. Cuyugan's as far as I understand what
6  was told to me.  I was not involved in the purchase or
7  development of the idea.  I was asked to help implement that
8  idea.
9      Q.  So Ms. Cuyugan was going to be your supervisor;
10 correct?
11     A.  Yes.
12     Q.  Based on your interactions with your supervisor,
13 Ms. Cuyugan, did you have a good relationship?
14     A.  Yes.  For the most part until what occurred at the
15 end, but I would say yes.
16     Q.  So now I'm referring to the time period while she
17 was your supervisor.
18     A.  Okay.
19     Q.  So you're saying that you did have a good
20 relationship with her; correct?
21     A.  Yes.
22     Q.  Based on your interactions with her did you
23 respect her?
24     A.  Yes.
25     Q.  Based on your interactions did you believe that

17

1  she knew what she was doing as in her position?
2         MS. STATON:  Object to the form, foundation.
3         Go ahead.
4      Q.  You can answer.
5      A.  As far as I could tell, as far as the information
6  that was provided to me.  I was not always provided a lot of
7  information, very, actually, very often not provided much
8  information about what was going on in Phoenix.  And so as
9  far as I knew, but I was somewhat in the dark about a lot of
10 what was occurring at the lobbying level or I would say
11 extensively in the dark about that.  And then I did not have
12 all the information, but as far as I could tell.
13     Q.  Based on your interactions with her and the ideas
14 that you exchanged, was it your perception that she knew
15 what she was doing?
16        MS. STATON:  Object to the form, foundation.
17     Q.  You can answer.
18        MS. STATON:  Yes.
19        You can answer the question if you can.
20        THE WITNESS:  Sure.
21        Again, as far as I could tell, she seemed to be
22 knowledgeable and doing the research necessary, but I was
23 coming in mid-legislative session, which I think is
24 important to note, so I didn't have full, full sense of how
25 the legislative priorities had been developed, what really

MICHAEL PEEL
4/19/2016

### Page 26

1  didn't know whether she wanted to do a good evaluation or
2  not a good evaluation; correct?
3        MS. STATON: Object to the form, argumentative,
4  lacks foundation.
5        THE WITNESS: I didn't know whether she wanted to
6  do a good or a bad evaluation; correct.
7     Q. Thank you. When did you first learn about the
8  fact that -- well, let's strike that.
9        Did anyone tell you that the department of state
10 and government relations was going to be eliminated?
11    A. No.
12       MS. STATON: You mean other than Ms. Cuyugan?
13    A. Yeah.
14       MS. STATON: I mean do you mean somebody --
15 because he had already testified she told him that.
16    A. You mean anyone other than Ms. Cuyugan?
17       MS. BONILLA: If you have an objection, I ask that
18 you please state your objection but not try to restate my
19 questions, Ms. Staton.
20       MS. STATON: Well, I'm not but I don't want to --
21       THE WITNESS: Yeah. No. It's important.
22    Q. So did anyone tell you that the department of
23 state and local government relations would be eliminated is
24 my question?
25       MS. STATON: Objection then, asked and answered.

### Page 27

1        THE WITNESS: Right.
2        MS. STATON: Go ahead.
3     Q. Go ahead. Answer.
4     A. Prior to my conversation with Dr. Harris after
5  Ms. Cuyugan told us, told the unit that it was being
6  eliminated on that date and later that afternoon I was told
7  that, no, nobody told me that. Nobody told me that the
8  office was being eliminated prior to Dr. Harris calling me
9  after that I was told by Ms. Cuyugan that the department was
10 being eliminated.
11    Q. So Ms. Cuyugan was the only person that told you
12 that the department was being eliminated; correct?
13    A. Yes.
14    Q. Did Ms. Cuyugan tell you who told her that?
15    A. Dr. Harris. She said she had had a meeting with
16 Dr. Harris, and she was very upset and speculating about why
17 it might be and didn't have the answers.
18       And I certainly had no answers, so it was alarming
19 to say the least. It's --
20       MS. STATON: Okay. You answered the question.
21    A. Sure.
22       MS. BONILLA: For the record I would just like
23 Mr. Peel to feel very comfortable answering questions in
24 answering his question --
25       MS. STATON: That's fine.

### Page 28

1        MS. BONILLA: -- and I wouldn't like Ms. Staton to
2  be instructing him as to not answering or stopping
3  questions.
4        MS. STATON: I will instruct Mr. Peel as I see
5  fit. He is here to answer your questions. I just don't
6  want him to go on forever and ever because this will take
7  forever and ever.
8        So if you have a question, ask him.
9        MS. BONILLA: I have the right to ask questions,
10 and he has the right to answer the questions as he sees fit.
11       THE WITNESS: I was finished. I just said it was
12 alarming three months into the job, not even three -- yeah,
13 three months basically into the job.
14    Q. It was alarming for you to learn that the
15 department was being eliminated; correct?
16    A. Apparently. That's what I was being told at the
17 time. And then it was less alarming, obviously, when I was
18 called in a few hours later and told that what Ms. Cuyugan
19 told me was not correct, that I was not being let go or even
20 potentially being let go.
21    Q. Do you have any information as to what Ms. Cuyugan
22 was told by Dr. Harris?
23       MS. STATON: Object to the form, lacks foundation.
24       THE WITNESS: I had very little information from
25 what Ms. Cuyugan told us. She said that -- she was very

### Page 29

1  upset so that she did not get into extensive detail about
2  their conversation other than we were being eliminated and
3  she was not clear why.
4        I recall Ms. Cuyugan having concerns about the
5  restructuring that could be occurring weeks prior, which was
6  concerning to me. As an employee, it was stressing me out a
7  lot to hear my supervisor so concerned and worried about the
8  future of the department for reasons I had no idea about.
9        And so that's all I knew is that I felt this sense
10 of a problem or issue was going to be arising based on her
11 concern. But I had no information myself about what could
12 be occurring until that day when she came in and said that
13 the department was being eliminated.
14    Q. So do you believe what Ms. Cuyugan told you about
15 the department being eliminated was true or false?
16       MS. STATON: Object to the form.
17       THE WITNESS: I, I believed her. I had no reason
18 to believe otherwise that she would -- why she would lie
19 about that, so I definitely believed her.
20       I was skeptical why I wouldn't have been called to
21 be told that I was being let go, though. I had some belief
22 optimism, that I would at least be -- there would be an
23 opportunity for me to stay on. I had done nothing to be let
24 go except work hard at the job I was doing.
25       So I was optimistic that there would still be a

MICHAEL PEEL
4/19/2016

### Page 30

1  role for me. I was hopeful, at least. Otherwise, no, I did
2  not think she was misstating that.
3      Q.  So the truth is that the department was not
4  eliminated, it was just that Ms. Cuyugan's and Pilita were
5  being terminated but you were staying; correct?
6      MS. STATON: Object to the form, foundation,
7  misstates the evidence.
8      THE WITNESS: The restructuring was occurring. It
9  was unclear how it was going to play out. But the way that
10 Ms. Cuyugan had stated it was all of us were being let go
11 and the department was being eliminated as far as she could
12 tell from the conversations she had had.
13     Q.  So based on your knowledge the truth is -- and
14 misstatement of evidence is not an objection.
15     MS. STATON: Go ahead and ask your question.
16     Q.  The truth is that you were not -- your position
17 was not eliminated; correct?
18     MS. STATON: Object to the form, foundation.
19 Misstates the evidence.
20     Go ahead.
21     THE WITNESS: My position was not eliminated.
22     Q.  Correct?
23     A.  Right. I found that out after I was told I might
24 be by Ms. Cuyugan.
25     Q.  So you continued working in that department and

### Page 31

1  you continued -- your position was not eliminated; correct?
2      MS. STATON: Object to the form, asked and
3  answered.
4      THE WITNESS: My position was not eliminated.
5      Q.  Correct?
6      A.  Correct.
7      Q.  Okay. So --
8      A.  The department was changing. As I mentioned, the
9  restructuring was occurring during that time period. It was
10 a lengthy process. So that had not been settled upon about
11 how that would look, and that was not explained to me at
12 that time how that would play out right away.
13     Q.  And how was it later explained to you?
14     A.  It was explained to me that the needs of the
15 college were changing, and capacity issues and such being
16 what they are with funding and staffing and everything that
17 it was being looked at in a more collaborative way, not as
18 unit based, not as much as an exclusive to one unit working
19 on government relations or community relations, that it
20 would be more of a larger scale effort. And I was then to
21 report to Rachelle Howell.
22     Q.  Are you still using your skills as a lobbyist?
23     A.  Can you restate the question?
24     Q.  Are you still using your skills -- let me ask you
25 something. What do you do now? What are your duties?

### Page 32

1      A.  My duties are still government relations,
2  community relations as well, which overlaps at times.
3      And so my title is now community and government
4  relations advanced analyst officially. And I'm also a
5  lobbyist for the college, an employee lobbyist, which I
6  wasn't prior, so that's why I was confused by your question.
7      I am using my skills from past work as a lobbyist
8  now that I have been asked to take those duties on.
9      Q.  That was my question.
10     A.  Yes. Yes. But prior I had not been -- when I
11 started I was not a lobbyist for the college. I was not
12 asked to do that. And we ended up hiring a contract
13 lobbyist as well.
14     So there's our contract lobbyist and then myself
15 and my director, Libby Howell, were asked to be employee
16 lobbyists, and we're registered with the state for lobbying
17 as we've done more extensive work in Phoenix as needed
18 depending on the legislative priority. And we focus on
19 priorities as needed, such as expenditure limitation.
20     We just were able to successfully work with the
21 Arizona Community College Coordinating Council to pass a
22 bill very beneficial for the college in March. So we're
23 thrilled that that was able to occur. And it was a major
24 benefit and achievement for the community colleges in
25 Arizona.

### Page 33

1      Q.  Wonderful.
2      So basically what I'm understanding and I want you
3  to explain to me is that the department itself was not
4  eliminated but reorganized, correct, where you have now
5  taken more of the duties that Ms. Cuyugan was performing?
6      MS. STATON: Object to the form, foundation.
7      THE WITNESS: I -- could you please restate the
8  question?
9      Q.  Sure.
10     A.  It seemed that there were multiple questions
11 there.
12     Q.  Sure. So the government relations aspect is
13 still, the department of government relations in a way
14 exists to this day; correct?
15     A.  It's been consolidated under media, community and
16 government relations. And soon after the restructuring
17 began federal relations was also included in that, whereas
18 before it had been designated to other individuals to focus
19 more on that.
20     I don't know the full history of why that
21 occurred, but the decision was made to bring it all together
22 to have more of a concerted effort, again, more of a
23 collaborative effort with the individuals involved.
24     So that's what the restructuring ended up being,
25 being restructured as is to be looking at media, community

MICHAEL PEEL
4/19/2016

### Page 34

1  and government relations together.
2  Q. So basically what happened is that there was a
3  reorganization; correct?
4  A. Yes.
5  Q. And under that reorganization the position of
6  lobbying for Pima Community College was placed under another
7  department?
8  A. Can you restate the question?
9  Q. Under the reorganization the aspect of lobbying
10 for the college was not eliminated but it was placed under
11 another department?
12    MS. STATON: Object to the form.
13    THE WITNESS: It was not immediately done in terms
14 of the restructuring like that.
15    The decision was made months later that a contract
16 lobbyist would be useful and to go through a competitive
17 bidding process for that contract lobbyist. And we were
18 able to secure one that has been very successful for the
19 college and one of the best lobbyists in the state is now
20 working for us and producing excellent results for the
21 college. It's been viewed by not just internally but
22 externally as a very wise strategic decision.
23 Q. But at Pima Community College inside they have a
24 person like you still doing lobbying for the college;
25 correct?

### Page 35

1  A. Can you rephrase the question? I'm not clear on
2  still doing, what you mean by that.
3  Q. You are still, you still are doing duties of
4  advocating and lobbying for Pima Community College; correct?
5     MS. STATON: Object to the form, foundation.
6     THE WITNESS: Again, I'm unclear your on still
7  doing because, as I stated earlier, I wasn't a lobbyist for
8  the college when I was first hired. I was hired as strictly
9  government relations and advanced analyst --
10 Q. I get it.
11 A. -- so that's why I'm unclear with your question.
12 Q. So what ended up happening on the reorganization
13 is that while you were under Imelda Cuyugan you were an
14 analyst; correct?
15 A. Advanced analyst.
16 Q. Advanced analyst.
17    And after your reorganization Ms. Cuyugan was
18 eliminated, and now after the fact what truly happened is
19 that you now have duties that you did not have before which
20 involve lobbying; correct?
21    MS. STATON: Object to the form.
22    THE WITNESS: I was asked to take on additional
23 duties including lobbying, yes, and not just myself, the new
24 director of the new department, media, community and
25 government relations department, executive director, Libby

### Page 36

1  Howell, who is also, as I mentioned before, an employee
2  lobbyist along with myself.
3  Q. So is Libby the same person as Rachelle?
4  A. No.
5  Q. So who is Libby Howell?
6  A. She is the executive director of media, community
7  and government relations as of last May, starting last May
8  of 2015.
9  Q. May, 2015?
10 A. Uh-huh.
11 Q. Was she working for Pima Community College that
12 you know of before May?
13 A. No.
14    MS. STATON: No, she wasn't? Or no, you don't
15 know?
16 A. No, she was not as far as I know.
17    MS. STATON: As far as you know?
18 A. Yeah. No. I don't -- no. She was prior working
19 with the Southwest Gas Company.
20 Q. Do you know if Libby Howell is a lobbyist?
21    MS. STATON: Objection, asked and answered.
22    THE WITNESS: Yes, she's a lobbyist.
23 Q. For Pima Community College?
24 A. Yes, employee lobbyist.
25 Q. So she works for Pima Community College?

### Page 37

1  A. Yes. She's the executive director for media,
2  community and government relations, and in that role she is
3  an employee lobbyist.
4  Q. So Pima Community College has employees, has
5  individuals employed like you and Ms. Libby Howell that are
6  lobbying for Pima Community College and outside lobbyists;
7  would that be correct?
8  A. We have one outside contract lobbyist.
9  Q. So what is the answer to my question?
10    MS. STATON: He just did.
11 Q. Is the question yes?
12 A. Yes. There --
13 Q. Is the answer yes? I'm sorry.
14    MS. STATON: Wait, wait.
15 Q. Let me rephrase it so it's clear for the record.
16 A. Yes, please.
17 Q. Just remember she's transcribing.
18 A. Yes.
19 Q. So what I'm understanding is that Pima Community
20 College as of May, 2015, has employees such as you and Libby
21 Howell lobbying for the college and an outside lobbyist
22 lobbying for the college; correct?
23    MS. STATON: Object to the form of the question.
24 Misstates his testimony.
25    THE WITNESS: Yes, that is correct. And the

RAYNBO COURT REPORTING, LTD.